Jane HODGSON, M.D.; Arthur Horowitz, M.D.; Michelle Roe, Alice Roe, Diana Roe, Nadine T., Janet T., and Ellen Z. individually and on behalf of all other persons similarly situated; Lauren Z.; Meadowbrook Women's Clinic, P.A., Planned Parenthood of Minnesota, a nonprofit Minnesota corporation, Midwest Health Center for Women, P.A., a nonprofit Minnesota corporation; Women's Health Center of Duluth, P.A., a nonprofit Minnesota corporation, Plaintiffs,

v.

The STATE OF MINNESOTA; Rudy Perpich, as Governor of the State of Minnesota; Hubert H. Humphrey, III, as Attorney General of the State of Minnesota, Defendants.

No. 3-81-538.

United States District Court,
D. Minnesota,
Third Division.

Nov. 6, 1986.

American Civil Liberties Union Foundation by Janet Benshoof, Rachel Pine and Suzanne Lynn, New York City, for plaintiffs.

Maslon, Edelman, Borman & Brand by William Pentelovitch, Minneapolis, Minn., for plaintiff Planned Parenthood of Minnesota.

Hubert H. Humphrey, III, Atty. Gen. of the State of Minn. by John Galus and Peter M. Ackerberg, Sp. Asst. Attys. Gen., St. Paul, Minn., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

ALSOP, Chief Judge.

The above-entitled matter came before the court for trial from February 10, 1986, until March 13, 1986, and for argument on June 11, 1986. Having considered the evidence and being fully advised in the premises, the court makes the following:

### FINDINGS OF FACT

I. *Introduction*

1. Plaintiffs Jane Hodgson, M.D., and Arthur Horowitz, M.D., are licensed physicians engaged in the practice of obstetrics and gynecology, including the performing of abortions, in Minnesota.

2. Plaintiff Meadowbrook Women's Clinic, P.A., provides birth control, abortions and related medical services to its patients, including unemancipated minor women under the age of 18 at a medical facility located in St. Louis Park, Minnesota.

3. Plaintiff Planned Parenthood of Minnesota provides birth control, abortions and related medical services to its patients, including unemancipated minor women under the age of 18, at a clinic located in St. Paul, Minnesota.

4. Plaintiff Midwest Health Center for Women provides birth control services, abortions, and related medical services to its patients, including unemancipated minor women under the age of 18, at a clinic located in Minneapolis, Minnesota.

5. Plaintiff Women's Health Center of Duluth, P.A., provides birth control services, abortions, and related medical services to its patients, including unemancipated minor women under the age of 18, at a clinic located in Duluth, Minnesota.

6. Plaintiff Alice Roe was a 16-year-old unemancipated minor and seven weeks pregnant at the commencement of this action. Alice Roe asserts that she was at that time mature and that notification of her parents of her desire to have an abortion would not have been in her best interests.

7. Plaintiff Michelle Roe was a 15-year-old unemancipated minor who was pregnant at the commencement of this action. Michelle Roe asserts that she was at that time mature and that notification of her parents of her desire to have an abortion would not have been in her best interests.

8. Diane Roe was a 16-year-old unemancipated minor and eight weeks pregnant at the commencement of this action. Diane Roe asserts that she was at that time mature and that notification of her parents of her desire to have an abortion would not have been in her best interests.

9. Plaintiff Nadine T. was a 16-year-old unemancipated minor and pregnant as of the time of the filing of the amended complaint in this action. Nadine T. asserts that she was at that time mature and that notification of her parents of her desire to have an abortion would not have been in her best interests.

10. Plaintiff Janet T. was a 16-year-old unemancipated minor and pregnant as of the time of the filing of the amended complaint in this action. Janet T. asserts that she was at that time mature and that notification of her father of her desire to have an abortion would have not been in her best interests.

11. Ellen Z. was a 17-year-old unemancipated minor and pregnant as of the time of the filing of the amended complaint in this action. Ellen Z. asserts that she was then mature and that notification of her father of her desire to have an abortion would not have been in her best interests.

12. Plaintiffs Alice Roe, Michelle Roe, Diane Roe, Nadine T., Janet T., and Ellen Z. represent a class composed of pregnant minors who assert that they are mature and that notification of one or both of their parents would not be in their best interests.

13. Lauren Z. is the mother of plaintiff Ellen Z. Lauren Z. asserts that notification of Ellen Z.'s father of Ellen Z's desire to have an abortion would not have been in Ellen Z.'s best interests.

14. Defendants are the State of Minnesota, its Governor and its Attorney General.

15. In 1981, the Legislature of the State of Minnesota enacted Minn.Laws 1981, ch. 228, codified as Minn.Stat. § 144.343(2)–(7). The statute was to become effective August 1, 1981.

16. Subdivision 2 of the statute generally requires physicians or their agents to attempt with reasonable diligence to notify the parents of an unemancipated minor under the age of 18 at least 48 hours before performing an abortion. Subdivision 3 defines "parent" as both parents if both are living, one parent if only one is living or if the second one cannot be located through reasonably diligent effort, or the guardian or conservator if the pregnant woman has one. Subdivision 4 of the statute provides that the statutory notice requirement does not apply when the parents have consented to the abortion, when prompt action is needed to preserve the life of the minor, or when the minor reports that she is a victim of sexual or physical abuse or neglect as defined in Minn.Stat. § 626.556. Subdivision 5 subjects anyone performing an abortion in violation of Minn.Stat. § 144.343(2)–(7) to criminal penalties and civil liability.

17. Subdivision 6 of the statute provides, in the alternative, that if subdivision 2 is ever enjoined by judicial order, then the same notice requirement shall be effective together with an optional procedure whereby an unemancipated minor may obtain a court order permitting an abortion without notice to her parents upon a showing that she is mature and capable of giving informed consent to an abortion or, if she is not mature, that an abortion without notice to her parents nevertheless would be in her best interests.

18. In their amended complaints, plaintiffs seek a declaratory judgment that Minn.Stat. § 144.343(2)–(7) violates the constitutions of the United States and the State of Minnesota and seek a permanent injunction against its enforcement. More particularly, plaintiffs claim that the statute violates their due process rights, both on its face and as applied; that the statute violates the equal protection clause; and that the statute violates the due process, privacy and equal protection provisions of Article I of the Minnesota Constitution and also constitutes the delegation of administrative power to Minnesota state courts in violation of article 3 of the Minnesota Constitution.

19. Before the statute took effect on August 1, 1981, plaintiffs sought a temporary restraining order and preliminary injunction against the statute.

20. On July 31, 1981, the court temporarily restrained enforcement of subdivision 2 of the statute, but denied plaintiffs' motion for an order temporarily restraining enforcement of subdivision 6. On March 22, 1982, the court preliminarily enjoined subdivision 2 but denied a preliminary injunction of subdivision 6. By virtue of these two rulings, the parental notification requirement and the judicial bypass option of subdivision 6 went into effect on August 1, 1981, and have remained in effect since that date.

21. By memorandum order of January 23, 1985, the court granted in part and denied in part defendants' motion for partial summary judgment as to all of plaintiffs' claims concerning the judicial bypass procedure of subdivision 6. Specifically, the court granted partial summary judgment for defendants by dismissing all of plaintiffs' state constitutional claims on jurisdictional grounds and by ruling that, on its face, the judicial bypass procedure in subdivision 6 does not violate the constitutional equal protection and due process rights of pregnant minors. The court concluded, however that plaintiffs should have the opportunity of a trial to prove their allegations that subdivision 6 is being applied unconstitutionally.

## II. *Availability of Abortion Services in the State of Minnesota*

22. Abortion services are less accessible in Minnesota than in the country as a whole. In Minnesota, 94% of the counties, or 82 out of 87 counties, have no readily available abortion provider. In 1982, 44% of women in Minnesota ages 15–44 lived in a county with an abortion provider as compared to 72% of the same group in the country as a whole.

23. Access to information about abortion services in out-state Minnesota is comparatively limited. Many second trimester patients come from counties with no abortion providers and thus with no media advertising or listing in telephone books for abortion services.

24. Abortions are performed in only four public and nine private hospitals in Minnesota, and then only if a staff doctor requests it. There are only two hospitals where a patient can walk in and obtain an abortion: Hennepin County Medical Center and St. Paul-Ramsey. Virtually all of Minnesota's abortion providers are located in the two major metropolitan areas of the state: Duluth and Minneapolis-St.Paul. Many women have to travel long distances to obtain abortion services.

25. The transportation problems facing women seeking abortion in Minnesota are illustrated by the experiences of those attending the Women's Health Center Clinic in Duluth. The Health Center serves women from 24 counties in Minnesota, 14 counties in Wisconsin, 4 counties in Michigan and the Canadian province of Ontario. Some of the women served by the Health Center drive six to seven hours to get to the clinic. Airline flights are not available from some areas. Bus service from some areas is infrequent, requiring some women to spend the night in Duluth.

Having to travel long distances creates barriers to obtaining services. These barriers include increased cost, particularly if lodging is required; delayed pregnancy diagnosis and delayed treatment of post-abortion complications; jeopardized privacy of women away from home; and more hazardous travel during winter.

Nearly 30% of all abortions performed in Minnesota in 1982 were obtained by women who lived outside the Twin Cities metropolitan area, an increase of 20% since 1976. The farther a women has to travel to obtain an abortion, the less likely she is to obtain one.

26. Women of all ages in Minnesota have abortions later in their pregnancies than in the United States as a whole. In 1981, 9.5% of women having abortions in the United States had second trimester abortions, while 13.5% of all women obtaining abortions in Minnesota did so in their second trimester. In 1982, 15% of women from outside the metropolitan area who had abortions did so during the second trimester as compared with only 10% of metro area women.

27. The cost of an abortion increases with gestational age because the procedure becomes more difficult and requires more skill on the part of the doctor. The Meadowbrook Clinic has the following fee schedule: under 12 weeks gestation, $225; 12–14 weeks, $275; 14–16 weeks, $395; 16–18 weeks, $450; 18–19 weeks, $550; and 19–21 weeks, $650. After 21 weeks, Meadowbrook refers patients to St. Paul-Ramsey Hospital where a later abortion (22 weeks) costs $1600–1800; or to Wichita, Kansas, where a late abortion (up to 24 weeks) costs $2000 cash. None of these fees includes the cost of transportation or lodging. Minnesota will fund abortions for indigent women only if the pregnancy is the result of rape or incest, or if continuing the pregnancy would endanger the life of the woman.

28. Unfavorable publicity surrounding the abortion procedures and delivery of services has dissuaded some physicians from performing abortions. For example, the Women's Health Center in Duluth has been unable to contract local physicians to perform abortions. The Center has had to import physicians from small communities some distance from Duluth. Physicians are also concerned about the bombings of

clinics and doctors' offices. Consequently, some physicians refer their abortion patients elsewhere.

III. *Application of Minn.Stat. § 144.343 in Minnesota, August 1, 1981, to March 13, 1986*

A. *Compliance with Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979)*

1. *Legal Standard*

29. Minnesota Statutes § 144.343(6) provides:

> (c)(i) If such a pregnant woman elects not to allow the notification of one or both of her parents or guardian or conservator, any judge of a court of competent jurisdiction shall, upon petition, or motion, and after an appropriate hearing, authorize a physician to perform the abortion if said judge determines that the pregnant woman is mature and capable of giving informed consent to the proposed abortion. If said judge determines that the pregnant woman is not mature, or if the pregnant woman does not claim to be mature, the judge shall determine whether the performance of an abortion upon her without notification of her parents, guardian, or conservator would be in her best interests and shall authorize a physician to perform the abortion without such notification if said judge concludes that the pregnant woman's best interests would be served thereby.

30. With the exception of a hearing occurring shortly after enactment of § 144.-343, judges in Minnesota have faithfully applied the standards set forth in subdivision 6. Those judges who consider themselves unable to faithfully apply this standard have consistently refused to hear bypass petitions.

31. Courts hearing bypass petitions regularly appoint guardians ad litem and provide appointed counsel to assist minors participating in bypass proceedings.

32. Judges, public defenders, and guardians ad litem do not adhere to a single interpretation of either the "maturity" or "best interests" standard. However, the variation in interpretation of these standards does not exceed that typical of verbally expressed legal standards. Moreover, these differences of interpretation do not produce different results in actual bypass proceedings.

2. *Expedition*

33. Courts in Hennepin, Ramsey, and St. Louis Counties schedule bypass hearings on a regular basis. When necessitated by pressing need, these courts will hear a number of petitions greater than that normally scheduled for a single day. These courts also have in place procedures for hearing bypass petitions outside of normal business hours on an emergency basis.

34. Two or three days commonly elapse between a minor's first contact with the court and the hearing on her petition. A delay of this duration creates an increased medical risk to an abortion patient, albeit small in magnitude, and may increase the emotional tension attendant upon the judicial proceeding. Moreover, this delay sometimes combines with scheduling difficulties of a minor or her clinic to produce a longer delay. Thus, the delay in the judicial bypass system as executed by courts in the metropolitan counties is burdensome to minor petitioners. However, this delay and its resultant burden are unavoidable and do not reflect a systemic failure to provide a judicial bypass option in the most expeditious practicable manner.

35. Although the court systems of the non-metropolitan areas have had less frequent occasion to apply the judicial bypass procedures than Hennepin, Ramsey, and St. Louis County courts, these court systems are acquainted with the statute and have applied it conscientiously when called upon to do so.

36. Courts of non-metropolitan counties called upon to hear bypass petitions generally have complied with their statutory obligation to advise petitioners of their right to appointed counsel and to provide such counsel upon request. These courts also

generally have appointed guardians ad litem to assist petitioners.

37. Despite conscientious efforts to provide an expeditious court bypass option in non-metropolitan areas, a number of counties are not served by a judge who is willing to hear bypass petitions. A minor in one of these counties must travel to another county, most commonly a metropolitan county, to obtain an expeditious hearing of her petition. Although burdensome, this necessity also does not reflect a systemic failure to provide a judicial bypass option in the most expeditious practicable manner.

38. On August 13, 1981, the Supreme Court of Minnesota issued an order directing that all petitions under subdivision 6 should initially be filed in and considered by the county courts throughout the state or, in the cases of Hennepin and Ramsey Counties, in the juvenile division of the district court of those two counties. In the same order, the Minnesota Supreme Court directed that all appeals should be on the record to a judge of the district court, including the district courts of Hennepin and Ramsey counties.

39. In an amended and supplemental order effective July 1, 1984, the Supreme Court of Minnesota provided that in a unified judicial district, an order denying a petition pursuant to the judicial bypass procedure shall be appealable on the record to two district court judges and if there be a division between those judges, the order denying the petition should stand.

40. No minor has been unable to obtain an expeditious appeal of an order denying her bypass petition.

### 3. *Anonymity*

41. Judges, public defenders, guardians ad litem, and court personnel involved in bypass proceedings are aware that Minn. Stat. § 144.343(6) requires that bypass proceedings be kept strictly confidential. Those involved in the proceedings take steps to insure confidentiality, including destroying interview notes, holding hearings in judges' chambers rather than in open court, and referring to petitioners by first name only. In addition, public defenders and courts have departed from normal routines when adhering to the routine would have threatened confidentiality.

42. The record discloses that the confidentiality of minors electing the judicial bypass option has been breached only in a small number of isolated cases.

### B. *Burdens Imposed by Minn.Stat. § 144.343(2)–(7)*

### 1. *Judicial Bypass Procedure*

43. As discussed above, scheduling practices in Minnesota courts typically require minors to wait two or three days between their first contact with the court and the hearing on their petitions. This delay may combine with other factors to result in a delay of a week or more. A delay of this magnitude increases the medical risk associated with the abortion procedure to a statistically significant degree. Even a shorter delay may push the minor into the second trimester, when the abortion procedure entails significantly greater costs, inconvenience, and medical risk.

44. The experience of going to court for a judicial authorization produces fear and tension in many minors. Minors are apprehensive about the prospect of facing an authority figure who holds in his hands the power to veto their decision to proceed without notifying one or both parents. Many minors are angry and resentful at being required to justify their decision before complete strangers. Despite the confidentiality of the proceeding, many minors resent having to reveal intimate details of their personal and family lives to these strangers. Finally, minors are left feeling guilty and ashamed about their lifestyle and their decision to terminate their pregnancy. Some mature minors and some minors in whose best interests it is to proceed without notifying their parents are so daunted by the judicial proceeding that they forego the bypass option and either notify their parents or carry to term.

Some minors are so upset by the bypass proceeding that they consider it more diffi-

cult than the medical procedure itself. Indeed, the anxiety resulting from the bypass proceeding may linger until the time of the medical procedure and thus render the latter more difficult than necessary.

### 2. Two Parent Notice Requirement

45. A minor who chooses not to go to court to avoid notifying her parents must notify both parents, if they are living, unless the second one cannot be located through reasonably diligent effort. The statute makes no exception for a non-custodial parent who is divorced or separated from the custodial parent, or for a parent who never married the custodial parent. No exception is made in the case of a parent, custodial or not, whom the minor considers likely to react abusively to notification, unless the minor is willing to declare that she is a victim of sexual or physical abuse.

46. If a minor declares that she is the victim of sexual or physical abuse, Minn. Stat. § 144.343(4)(c) obligates the recipient of this information to report it to the local welfare agency, police department, or the county sheriff pursuant to Minn.Stat. § 626.556(3). This obligation binds counselors and physicians at abortion clinics. The welfare agency must report the information to the law enforcement agency, and vice versa. Minn.Stat. § 626.556(3).

47. Minors who are victims of sexual or physical abuse often are reluctant to reveal the existence of the abuse to those outside the home. More importantly, notification to government authorities creates a substantial risk that the confidentiality of the minor's decision to terminate her pregnancy will be lost. Thus, few minors choose to declare they are victims of sexual or physical abuse despite the prevalence of such abuse in Minnesota, as elsewhere.

48. In practice, the requirement that the minor notify both parents, if living, affects many minors in single parent homes who have voluntarily notified the custodial parent. No exception is made, for example, in the case of a non-custodial parent who for years has exhibited no interest in the minor's development. No exception is made for parents likely to react with psychological, sexual or physical violence toward either the minor or the custodial parent. Minors in such circumstances must notify the non-custodial parent, or else go to court for authorization to proceed without notifying the non-custodial parent. Notification of an abusive or even a disinterested absent parent may reintroduce that parent's disruptive or unhelpful participation into the family at a time of acute stress. Alternatively, going to court to seek authorization introduces a traumatic distraction into the family relationship at a stressful juncture. The emotional trauma attending either option tends to interfere with and burden the parent-child communication the minor voluntarily initiated with the custodial parent.

49. The two parent notification requirement also affects minors in two parent homes who voluntarily have consulted with one parent but not with the other out of fear of psychological, sexual, or physical abuse toward either the minor or the notified parent. Here, too, the minor must choose either to notify the second parent or to endure the court bypass procedure. Once again, the emotional trauma attending either option tends to interfere with and burden the parent-child communication the minor voluntarily initiated with the custodial parent.

50. Instances, such as those described above, in which the requirement that the minor notify both parents of her decision interferes with and burdens parent-child communication voluntarily initiated by the minor are not uncommon. Approximately 20–25% of minors who go to court for authorization are accompanied by one parent or indicate that they have already consulted with one parent.

### 3. Forty-Eight Hour Waiting Period

51. Minors who elect to notify one or both parents by written notice, including those whose parents refuse to sign acknowledgment forms despite having been told of their daughters' decision, must wait

until 48 hours after actual or constructive delivery of written notice. Constructive delivery of mailed notice occurs at noon on the regular mail delivery day following mailing. Thus, Minn.Stat. § 144.343 delays effectuation of a minor's decision to terminate her pregnancy by at least 48 hours and more commonly by 72 hours.

52. This statutorily imposed delay frequently is compounded by scheduling factors such as clinic hours, transportation requirements, weather, a minor's school and work commitments, and sometimes a single parent's family and work commitments. In many cases, the effective length of the delay may reach a week or more.

53. Delay of any length in performing an abortion increases the statistical risk of mortality and morbidity. The increase in risk becomes statistically significant when the length of delay reaches one week. Moreover, even delays of less than one week may push a woman into the second trimester. Second trimester procedures entail significantly greater costs, inconvenience, and risk.

### C. *Results of Bypass Proceedings, August 1, 1981, to March 1, 1986*

54. The parties agreed to submit statistics reflecting disposition of bypass petitions filed in Minnesota from August 1, 1981, to March 1, 1986, in the form of tables compiling information obtained by affidavit from court officials in each Minnesota county. The table summarizing these statistics by judicial district is appended hereto.

55. During the period for which statistics have been compiled, 3,573 bypass petitions were filed in Minnesota courts. Six petitions were withdrawn before decision. Nine petitions were denied and 3,558 were granted.

56. Anomalous circumstances surrounded several of the petitions which were denied. Three denials occurred in Hennepin County. The Honorable Allen Oleisky, Judge of the Hennepin County District Court, Juvenile Division, recalls denying two of the more than one thousand petitions he has heard. One of these petitions

was brought by a minor who did not actually wish to have an abortion, but rather to marry her boyfriend. Judge Oleisky denied the petition in order to assist the minor in effectuating this desire by shifting responsibility for preventing the abortion from the minor to the court. The second denial involved a minor whom the judge determined was being coerced into having an abortion by her parents. After determining the minor did not actually wish to have an abortion, Judge Oleisky denied the petition.

The Honorable Gerald G. Martin, County Court Judge for the St. Louis County Family and Juvenile Court, granted all but one of the 225 or 226 petitions he heard during the period for which statistics were compiled. The petition Judge Martin denied was submitted by a rather immature 14 year old who was accompanied to court by her mother. The minor's father had been out of contact with the minor and her mother for more than seven years. Rather than proceed to the best interests inquiry, Judge Martin denied the petition because he was certain a notice mailed to the father's last known address would not reach him.

57. The single denials occurring in Anoka, Mower, and Lyon Counties each occurred in the first petition brought in those respective counties. The Nobles County Court denied one of the two petitions brought there to date. A comparison to the experience in the metropolitan counties, where the courts have heard large numbers of petitions and granted nearly all, suggests that some or all of the denials occurring in non-metropolitan counties are due more to the courts' unfamiliarity with the judicial bypass statute than to the petitioners' immaturity or best interests. For example, the Anoka County Court denied the first petition brought before it and then granted each of the 19 petitions heard during the remainder of the period for which statistics were compiled.

### D. *Effectuation of State Interests*

### 1. *Asserted State Interests*

58. The Minnesota legislature had several purposes in mind when it amended

Minn.Stat. § 144.343 in 1981. The primary purpose was to protect the well-being of minors by encouraging minors to discuss with their parents the decision whether to terminate their pregnancies. Encouraging such discussion was intended to achieve several salutory results. Parents can provide emotional support and guidance and thus forestall irrational and emotional decision-making. Parents can also provide information concerning the minor's medical history of which the minor may not be aware. Parents can also supervise post-abortion care. In addition, parents can support the minor's psychological well-being and thus mitigate adverse psychological sequelae that may attend the abortion procedure.

59. The court finds that a desire to deter and dissuade minors from choosing to terminate their pregnancies also motivated the legislature. Testimony before a legislative committee considering the proposed notification requirement indicated that influential supporters of the measure hoped it "would save lives" by influencing minors to carry their pregnancies to term rather than aborting.

### 2. *Testimony as to Beneficial Effect of Minn.Stat. § 144.343*

### a. *Judicial Bypass/Notice Requirement*

60. The court heard testimony of judges who collectively have adjudicated over 90 percent of the parental notification petitions filed since August 1, 1981. None of these judges, on direct or cross examination, identified a positive effect of the law.

Honorable Allen Oleisky has heard over 1,000 parental notification petitions. He characterizes his function as "a routine clerical function on my part, just like putting my seal and stamp on it." Moreover, he believes that the statute dissuades some minors from having abortions because of the fear of going to court in a distant city.

Honorable Gerald Martin stated that he doesn't "perceive any useful public purpose to what [he is] doing in these cases;" more-over, he finds the court experience difficult for minors. "I think they find it a very nervewracking experience," he testified.

Honorable Neil Riley testified that he saw no beneficial effects of the statute and further that he sympathized with "the predicament" the minors were in.

Honorable William Sweeney testified, "I know as a judge you would like to think your decisions are important, that you are providing some—you are doing some legitimate purpose. What I have come to believe ... [is] that really the judicial function is merely a rubber stamp. The decision has already been made before they have gotten to my chambers. The young women I have seen have been very mature and capable of giving the required consent."

He further testified that "the level of apprehension that I have seen contrasted with even the orders for protection, which is a very intense situation, very volatile, and the custody questions, is that the level of apprehension is twice what I normally see in court.... You see all the typical things that you would see with somebody under incredible amounts of stress, answering monosyllabically, tone of voice, tenor of voice, shaky, wringing of hands, you know, one young lady had her—her hands were turning blue and it was warm in my office...."

Mr. Paul Garrity, who adjudicated the same bypass petitions while a judge in Massachusetts, believed that the Massachusetts law accomplished nothing. "It just gives these kids a rough time. I can't think it accomplishes a darn thing. I think it basically erects another barrier to abortion." Further, he felt going to court was "absolutely" traumatic for minors. "You know, it was just—it was just another thing at a very, very difficult time in their lives," he said.

61. Clinic counselors, who participate on a daily basis in the law's implementation, are of a similar mind. Paula Wendt has counseled or supervised the counselling of more than 3,000 minors since the law went into effect. She concludes from her con-

versations with both parents and minors that the law has not promoted family integrity or communication. The law has, more than anything, disrupted and harmed families.

On the basis of her experience, Tina Welsh concludes that the law has not benefitted intra-family communication. A minor's unplanned pregnancy is a crisis which is not conducive to an attempt to build good family communications. Ms. Welsh does not believe that the law helps teenagers make a better decision about whether to have an abortion or continue the pregnancy. Requiring a minor to tell either her parents or a judge about her pregnancy and the reasons she wants an abortion makes no beneficial contribution to the minor's decision.

62. The public defenders who participate in bypass proceedings believe that the law serves no beneficial purpose. Its sole function, in their view, is to create a hurdle and impose additional stress upon the young women. Similarly, the guardians ad litem do not perceive a beneficial purpose to their participation in the process.

63. In most cases, minors seeking judicial authorization to terminate their pregnancies without informing their parents have already made up their minds before coming to court. Thus, judges, public defenders, and guardians ad litem find they impart no information and provide no counseling in the course of the bypass proceeding. Neither does the court system refer minors to their parents for guidance and support, as is demonstrated by the overwhelming rate of approval. At most, the bypass proceeding furthers the state's interest in providing minors with guidance and emotional support only insofar as the abortion clinics have expanded their counseling of minors at the insistence of judges who hear the petitions. Counselors and administrators from the major Minnesota clinics testified, however, that counseling of minors going to court and that of minors who do not differs merely in that the former are counseled about the court process and the latter are not.

64. Minors who seek authorization in Minnesota courts for confidential abortions tend to be above average in intelligence, education, and personal motivation. They also tend to be ambitious and concerned about the effect their decision will have on their futures.

65. Minnesota courts have denied only an infinitesimal proportion of the petitions brought since 1981. This fact indicates that in Minnesota immature, non-best interest minors rarely seek judicial authorization to terminate their pregnancies without parental involvement. Such minors either inform their parents, obtain an abortion outside Minnesota, or carry the pregnancy to term.

Dr. Gary B. Melton suggested two partial explanations for this phenomenon. First, comparisons of personality functioning between adolescents who abort and those who carry to term generally show more adaptive, healthier functioning in the former group. Adaptation, in turn, marks a level of psychological and emotional development colloquially referred to as "maturity." Second, a minor's desire to maintain a measure of privacy of information about her personal matters is an important indication of individuation, a principal developmental task of adolescence. Indeed, defendants' witness Dr. Vincent Rue testified that teenagers in the early stage of adolescence are much more likely to discuss a pregnancy than are teenagers in the mid-phase of adolescence who typically would desire more privacy, and teenagers in the latter stages of adolescence who would be the most private, and insist upon confidentiality. Adult women, in Dr. Rue's view, would be most insistent upon maintaining the confidentiality of their decision. Therefore, while there may be "no logical relationship between the capacity to become pregnant and the capacity for mature judgment concerning the wisdom of an abortion," *H.L. v. Matheson,* 450 U.S. 398, 408, 101 S.Ct. 1164, 1170, 67 L.Ed.2d 388 (1981), some relationship does exist between the decision to abort in privacy and the capacity for mature judgment concern-

ing the wisdom of this decision. Consequently, a regulation that affects only minors who have elected to terminate their pregnancies and to do so in privacy tends inevitably to reach only mature minors and immature minors driven to this choice by their own best interests. Such a regulation will fail to further the State's interest in protecting immature, non-best interest minors.

66. Dr. Jane Hodgson, a leading practitioner in the field of obstetrics and gynecology, has given Minnesota's parental notification law considerable thought. She concludes, "I honestly think there is no benefit whatsoever." The law has created "nothing but problems" for her teenage patients. Testimony by plaintiffs' other expert witnesses, each of unquestionably high standing in his or her respective field, corroborates this opinion. For example, Dr. Stephen Butzer testified, on the basis of his clinical experience, that when knowledge of an adolescent's pregnancy or abortion is inadvertently communicated to one or both parents, the effect of the communication on the family or relationship between adolescent and parents is "almost universally negative."

67. Defendants offered the court no persuasive testimony upon which to base a finding that Minnesota's parental notification law enhances parent-child communications, or improves family relations generally. Dr. Vincent Rue possesses neither the academic qualifications nor the professional experience of plaintiffs' expert witnesses. More importantly, his testimony lacked the analytical force of contrary testimony offered by plaintiffs' witnesses. Dr. Richard T.F. Schmidt does not practice medicine in Minnesota, has never performed an abortion, and does not regularly counsel minors who wish to obtain abortions. Therefore, his testimony is less persuasive than the contrary testimony of witnesses closer in each of these respects to the issue before the court.

The court did not expect defendants to establish that in every case Minnesota's parental notification law protects pregnant minors, promotes parent-child communication, and improves family relations generally. Defendants did establish that notification can serve these interests in individual cases. Defendants failed, however, to establish that the law promotes these values more than it undermines them. Five weeks of trial have produced no factual basis upon which the court can find that Minn. Stat. § 144.343(2)–(7) on the whole furthers in any meaningful way the State's interest in protecting pregnant minors or assuring family integrity.

b. *Two Parent Requirement*

68. National statistics reveal that approximately one out of every two marriages ends in divorce. There is no testimony in the trial of this case indicating that the divorce rate in Minnesota differs from the national average. To the contrary, clinic experience indicates that only 50% of minors in the state of Minnesota reside with both biological parents. This figure is corroborated by one study indicating that 9% of minors in Minnesota live with neither parent, 33% live with only one parent and thus 42% do not live with both biological parents.

69. Studies indicating that family violence occurs in two million families in the United States substantially underestimate the actual number of such families. In Minnesota alone, reports indicate that there are an average of 31,200 incidents of assault on women by their partners each year. Based on these statistics, state officials suggest that the "battering" of women by their partners "has come to be recognized as perhaps the most frequently committed violent crime in the state" of Minnesota. These numbers do not include incidents of psychological or sexual abuse, low-level physical abuse, abuse of any sort of the child of a batterer, or those incidents which are not reported. Many minors in Minnesota live in fear of violence by family members; many of them are, in fact, victims of rape, incest, neglect and violence. It is impossible to accurately assess the magnitude of the problem of family vio-

lence in Minnesota because members of dysfunctional families are characteristically secretive about such matters and minors are particularly reluctant to reveal violence or abuse in their families. Thus the incidence of such family violence is dramatically underreported.

70. Divorce or separation usually impairs family communication severely. The non-custodial parent often has very little communication with the child. In addition, communication between divorced or separated spouses frequently is marked with the kind of hostility and angry vindictiveness that characterized the divorce or separation.

The effect of compelling an adolescent to share information about her pregnancy and abortion decision with both parents in a divorced or separated situation can be harmful. The non-custodial parent often will reintegrate with the family in a disruptive manner. The adolescent may be perplexed as to why the non-custodial parent should become an important factor in her life at this point, especially when the parent previously has paid her little attention and offered little support. Moreover, the testimony revealed no instances in which beneficial relations between a minor and an absent parent were reestablished following required notification. Therefore, the minor may suffer disappointment when an anticipated reestablishment of her relationship with the absent parent does not occur, as is most likely given the trying circumstances under which communication is renewed.

Involuntary involvement of the second biological parent is especially detrimental when the minor comes from an abusive, dysfunctional family. Notification of the minor's pregnancy and abortion decision can provoke violence, even where the parents are divorced or separated. Studies have shown that violence and harrassment may continue well beyond the divorce, especially when children are involved.

The reaction of the custodial parent to the requirement of forced notification is often one of anger, resentment and frustration at the intrusion of the absent parent.

Frequently, the custodial parent fears that the absent parent will use the notification to threaten the custody rights of the custodial parent. Furthermore, a mother's perception in a dysfunctional family that there will be violence if the father learns of the daughter's pregnancy is likely to be an accurate perception.

71. Twenty to twenty-five percent of the minors who go to court either are accompanied by one parent who knows and consents to the abortion or have already told one parent of their intent to terminate their pregnancy. The vast majority of these voluntarily informed parents are women who are divorced or separated from spouses whom they have not seen in years. Going to court to avoid notifying the other parent burdens the privacy of both the minor and the accompanying parent. The custodial parents are angry that their consent is not sufficient and fear that notification will bring the absent parent back into the family in an intrusive and abusive way.

72. Minors who ordinarily would notify one parent may be dissuaded from doing so by the two-parent requirement. A minor who must go to court for authorization in any event may elect not to tell either parent. In these instances, the requirement that minors notify both biological parents actually reduces parent-child communication.

### c. 48 Hour Waiting Period

73. Some period of mandatory delay between the time of actual or constructive notification of the minor's parent and the abortion itself would reasonably effectuate the State's interest in protecting pregnant minors. A waiting period may allow parents to aid, counsel, advise, and assist minors in determining whether to undergo an abortion or to provide the physician with information which may be relevant to the medical judgments involved.

74. The interest effectuated by the State's 48 hour waiting period could be effectuated as completely by a shorter waiting period. Therefore, to the extent

the waiting period exceeds that necessary to allow parents to consult with minors contemplating abortion, it fails to further the State's interest in protecting pregnant minors.

## CONCLUSIONS OF LAW

Plaintiffs attack the constitutionality of Minn.Stat. § 144.343 on several fronts. First, plaintiffs contend that § 144.343, subd. 2 is facially unconstitutional because it fails to afford minors the opportunity to obtain a judicial or administrative waiver of the statute's notification requirement. *See Planned Parenthood Ass'n. of Kansas City v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983) (*Ashcroft*); *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II*). Second, plaintiffs contend that even with the judicial bypass procedure of subd. 6 incorporated as subd. 2(c) by virtue of this court's temporary restraining order of July 31, 1981, § 144.343(2)–(7), as applied in Minnesota, unduly burdens the fourteenth amendment due process rights of pregnant minors. Even if § 144.343(2)–(7) is not unconstitutional in its entirety, plaintiffs contend that the statute's requirement that minors notify both parents except when one parent is dead or the minor is unable to locate a parent with reasonable diligence, § 144.343(2), (3), is unconstitutional. Finally, plaintiffs contend the 48–72 hour waiting period imposed upon minors who choose to notify one or both of their parents in writing, *see* Minn.Stat. § 144.343(2)–(4), is unconstitutional because it impermissibly burdens a minor's right to choose abortion.

Noting "a requirement unduly burdensome in operation will be struck down even if not clearly invalid on its face," *see Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1011 (1st Cir.1981), this court denied defendant's motion for summary judgment with respect to plaintiffs' as applied due process challenge to § 144.343(2)–(7). *Hodgson v. Minnesota*, Civ. No. 3–81–538 slip op. at 11 (Jan. 23, 1985) [Available on WESTLAW, DCTU database]. The court found that dispute existed with respect to material issues of fact including the confidentiality of the judicial bypass procedure, delays and inconvenience, and lack of access to the courts in rural counties. This list of material facts was not all inclusive. *Hodgson*, slip op. at 10. Therefore, the action proceeded to trial upon these issues and others.

## I. *Standard of Review*

■ Every woman has the fundamental right to terminate her pregnancy free from unwarranted government intrusion. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *see Thornburgh v. American College of Obstetricians and Gynecologists*, — U.S. —, 106 S.Ct. 2169, 2178, 90 L.Ed.2d 779 (1986) (specifically reaffirming *Roe v. Wade*); *City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 420, 103 S.Ct. 2481, 2487, 76 L.Ed.2d 687 (1983) (*Akron*) (similar). The right to choose abortion rather than childbirth is "not unqualified and must be considered against important state interests in regulation." *Roe v. Wade*, 410 U.S. at 154, 93 S.Ct. at 727. Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy. *Maher v. Roe*, 432 U.S. 464, 473–74, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977).

■ A state regulation that burdens an individual's right to decide to terminate her pregnancy by substantially limiting her access to the means of effectuating that decision is subject to strict judicial scrutiny. *Carey v. Population Services International*, 431 U.S. 678, 688, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977). Such a burden is imposed by a regulation that places an obstacle, absolute or otherwise, in the path of one seeking to exercise the protected right. *Maher v. Roe*, 432 U.S. 464, 472, 97 S.Ct. 2376, 2381, 53 L.Ed.2d 484 (1977).

The term "undue burden" does not accurately describe the magnitude of interference necessary to trigger heightened judicial scrutiny. The Supreme Court has

squarely rejected this analysis as "wholly incompatible with the existence of the fundamental right recognized in *Roe v. Wade.*" *Akron*, 462 U.S. at 419–21 n. 1, 103 S.Ct. at 2487–88 n. 1. Indeed, the Court's traditional three tiered constitutional analysis exists to provide the courts a value-neutral framework by which to test the constitutionality of legislative enactments. Determining whether a burden is "undue" as a threshold inquiry would leave available to judges no standard for making this determination but their individual assessment of a statute's worth. *Cf. Mississippi University for Women v. Hogan*, 458 U.S. 718, 724 n. 9, 102 S.Ct. 3331, 3336 n. 9, 73 L.Ed.2d 1090 (1982) ("[W]hen a classification expressly discriminates on the basis of gender, the analysis and level of scrutiny applied to determine the validity of the classification do not vary simply because the objective appears acceptable to individual Members of the Court. While the validity and importance of the objective may effect the outcome of the analysis, the analysis itself does not change."). Thus the term "undue burden" as used, for example, in *Maher*, 432 U.S. at 473–74, 97 S.Ct. at 2382, refers to the ultimate constitutional issue under heightened judicial scrutiny, rather than the threshold requirement for triggering such scrutiny. *Charles v. Carey*, 627 F.2d 772, 777 (7th Cir.1980); *Planned Parenthood of Rhode Island v. Board of Medical Review*, 598 F.Supp. 625, 630 n. 2 (D.R.I. 1984).

▮ Regulations imposing a constitutionally significant burden on the free exercise of a protected right, including the right to choose to terminate one's pregnancy, must be supported by a compelling state interest. *Akron*, 462 U.S. at 427, 103 S.Ct. at 2490; *Roe v. Wade*, 410 U.S. at 155, 93 S.Ct. at 727. Such a regulation must also be narrowly drawn to express only the legitimate state interests at stake. *Carey v. Population Services International*, 431 U.S. 678, 686, 688, 97 S.Ct. 2010, 2016, 2017, 52 L.Ed.2d 675 (1977).

▮ Constitutional rights do not mature and come into being only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights. *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976) (*Danforth*). *See Bellotti II*, 443 U.S. at 633, 99 S.Ct. at 3042; *Carey v. Population Services International*, 431 U.S. at 693, 97 S.Ct. at 2020. Similarly, the burdens imposed by state regulation of abortion are no different for minors than for adults. *Zbaraz v. Hartigan*, 763 F.2d 1532, 1536 (7th Cir.1985), *appeal docketed*, No. 85–673 (U.S. Oct. 16, 1985); *see Bellotti II*, 443 U.S. at 642, 99 S.Ct. at 3047. ("[T]he potentially severe detriment facing a pregnant woman is not mitigated by her minority. Indeed, considering her probable education, employment skills, financial resources, and emotional maturity, unwanted motherhood may be exceptionally burdensome for a minor."). Therefore, the degree of burden that triggers heightened judicial scrutiny depends in no way upon whether the regulation applies to minor or adult women.

▮ The Supreme Court, however, long has recognized that a State has somewhat broader authority to regulate the activities of children than of adults. *Danforth*, 428 U.S. at 74, 96 S.Ct. at 2843. This broader authority derives from the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing. Thus the difference between abortion statutes which regulate adults and those which regulate only minors is that the latter may be justified by a significant state interest that is not present in the case of an adult. *Zbaraz v. Hartigan*, 763 F.2d at 1536. *See Akron*, 462 U.S. at 427 n. 10, 103 S.Ct. at 2490 n. 10; *Carey v. Population Services International*, 431 U.S. at 693 n. 15, 97 S.Ct. at 2020 n. 15; *Danforth*, 428 U.S. at 75, 96 S.Ct. at 2843. In addition, the State is not constitutionally bound to employ the least burdensome method of effectuating its interests. *Indiana Planned Parenthood*

*Affiliates Ass'n, Inc. v. Pearson,* 716 F.2d 1127, 1133 (7th Cir.1983) (*Pearson* ). *Compare Pearson with Carey v. Population Services,* 431 U.S. at 688, 97 S.Ct. at 2017 (state regulation burdening the right of adult women to terminate their pregnancies must "be narrowly drawn to express only the legitimate state interests at stake.") Instead, the state regulation must be rationally calculated to serve the state's significant interests. *Planned Parenthood of Rhode Island v. Board of Medical Review,* 598 F.Supp. 625, 640 (D.R.I.1984).

■ As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interests of the minor. *Bellotti II,* 443 U.S. at 640, 99 S.Ct. at 3046. Therefore, a State's interest in protecting immature minors will sustain the requirement of consent, either parental or judicial. *Akron,* 462 U.S. at 439, 103 S.Ct. at 2497. But even the State's interest in encouraging parental involvement in their minor children's decision to have an abortion must give way to the constitutional right of a mature minor or an immature minor whose best interests are contrary to parental involvement. *Id.* at 427 n. 10, 103 S.Ct. at 2490 n. 10; *Planned Parenthood of Rhode Island v. Board of Medical Review,* 598 F.Supp. at 640. *See Bellotti II,* 443 U.S. 649, 99 S.Ct. at 3051.

■ Even under the less rigorous standard applicable to regulations burdening the rights of minor women to obtain an abortion, the burden of demonstrating a connection between the regulation and the asserted state policy falls on the state. *Carey v. Population Services International,* 431 U.S. at 696, 696 n. 22, 97 S.Ct. at 2022, n. 22; *Pearson,* 716 F.2d at 1133. Neither a bare assertion that the burden is connected to a significant state policy, *Carey,* 431 U.S. at 696, 97 S.Ct. at 2022, nor sentiment or folklore, *In re Gault,* 387 U.S. 1, 21–22, 87 S.Ct. 1428, 1440, 18 L.Ed.2d 527 (1967), will satisfy this burden.

■ Minnesota Statute § 144.343(2)–(7) requires minors either to notify their parents of their desire to obtain an abortion, or to obtain the judicial waiver of this requirement. The statute does not require parental consent or a waiver of parental consent. The parties agreed in response to a question from the court that the constitutional analysis applicable to notice requirements does not differ from that applicable to consent requirements. Moreover, despite the contrary suggestions of individual Members of the Supreme Court, *see Akron,* 462 U.S. at 469, 103 S.Ct. at 2513 (O'Connor, J., dissenting); *H.L. v. Matheson,* 450 U.S. 398, 421, 101 S.Ct. 1164, 1177, 67 L.Ed.2d 388 (Stevens, J., concurring), the court concludes that it is "parental involvement" that an emancipated or mature minor must have an opportunity to avoid, without regard to whether that "involvement" takes the form of notification or consent. *See Akron,* 462 U.S. at 427 n. 10, 103 S.Ct. at 2490 n. 10; *Pearson,* 716 F.2d at 1132. *See also Bellotti II,* 443 U.S. at 647, 99 S.Ct. at 3050 (statute unconstitutional because, *inter alia,* it failed to provide every minor an opportunity to "go directly to a court without first consulting or notifying her parents").

## II. *Minn.Stat. § 144.343(2)*

Subdivision 2 of § 144.343 prohibits performing an abortion upon an unemancipated minor, or upon a woman for whom a guardian or conservator has been appointed because of a finding of incompetency, until at least 48 hours after written notice of the pending operation has been delivered to the minor's parents or guardian or conservator. By its order of July 31, 1981, this court temporarily restrained defendants from enforcing the provisions of Minn. Stat. § 144.343(2) because the court found it probable that plaintiffs would be successful in their challenge to subdivision 2. As a result of this restraining order, subdivision 6 of § 144.343 took effect. This subdivision provides that subdivision 2 shall be enforced as though the judicial bypass provisions of subdivision 6 were incorporated

as paragraph c of subdivision 2. Subdivision 6 further provides that if the court's temporary injunction is ever stayed or dissolved, or otherwise ceases to have effect, subdivision 2 shall have full force and effect, without being modified by the addition of the substitute paragraph, and the substitute paragraph shall have no force or effect until or unless an injunction or restraining order is again in effect.

A State choosing to encourage parental involvement in their minor child's decision to have an abortion must provide an alternative procedure through which a minor may demonstrate that she is mature enough to make her own decision or that the abortion is in her best interests. *Akron*, 462 U.S. at 430 n. 10, 103 S.Ct. at 2492 n. 10; *see Bellotti II*, 443 U.S. at 643–44, 99 S.Ct. at 3048. The unique nature and consequences of the abortion decision make it inappropriate "to give a third party an absolute, and possibly arbitrary, veto over the decision of a physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." *Bellotti II*, 443 U.S. at 643, 99 S.Ct. at 3048; *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976).

The *Bellotti II* court set forth the following requirements:

> A pregnant minor is entitled in such a proceeding to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made must assure that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained.

443 U.S. at 643–44, 99 S.Ct. at 3048. A statute that fails to provide such an alternative to a consent or notification requirement imposes an undue burden upon the exercise by minors of the right to seek an abortion. *Id.*, at 647, 99 S.Ct. at 3050.

Without the judicial bypass option of subdivision 6, Minn.Stat. § 144.343(2) would unduly burden the exercise by minors of the right to seek an abortion. There are parents who would obstruct, and perhaps altogether prevent, the minor's efforts to exercise this right. *Bellotti*, 443 U.S. at 647, 99 S.Ct. at 3050. Young, pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct an abortion. *Id.; Indiana Planned Parenthood Affiliates Ass'n, Inc. v. Pearson*, 716 F.2d 1127, 1132 (7th Cir.1983). The interests of the State, and of these parents, must give way to the constitutional right of a mature minor or of an immature minor whose best interests are contrary to parental involvement. *See, e.g., Akron*, 462 U.S. at 428 n. 10, 103 S.Ct. at 2491 n. 10. Therefore, the court concludes that it must permanently enjoin defendants from enforcing Minn. Stat. § 144.343(2) as unmodified by subdivision 6.

### III. *Constitutionality of Minnesota's Parental Notification Law*

Plaintiffs contend that Minn.Stat. § 144.343(2)–(7) is unconstitutional as applied because it interferes with and burdens minors in the exercise of their constitutional rights and defendants have failed to demonstrate that the statute is necessary, narrowly drawn, and that it is accomplishing significant state interests. Defendants respond that plaintiffs' position improperly asks this court to disregard controlling Supreme Court precedent. In view of the fact that the relevant legal standards governing the constitutionality of parental notification requirements are not in dispute, *see Akron*, 462 U.S. at 439, 103 S.Ct. at 2497, defendants contend that the scope of this court's inquiry properly is restricted to determining whether the statute complies with the guidelines set forth by the *Bellotti II* plurality and subsequently approved by majority of the Supreme

Court in *Planned Parenthood Ass'n. of Kansas City v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983).

Plainly, it is within neither the power nor the desire of this court to overrule Supreme Court precedent. *E.g., Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535, 103 S.Ct. 1343, 1344, 75 L.Ed.2d 260 (1983); *Jaffree v. Board of School Commissioners*, 459 U.S. 1314, 1316, 103 S.Ct. 842, 843, 74 L.Ed.2d 924 (Powell, Circuit Justice 1983). Nevertheless, the court is mindful that:

> Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry ... and the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist.

*United States v. Carolene Products Co.*, 304 U.S. 144, 153, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938) (Citations omitted); *see New Jersey Citizen Action v. Edison Township*, 797 F.2d 1250, 1260 (3d Cir. 1986). *Compare Wisconsin Action Coalition v. City of Kenosha*, 767 F.2d 1248 (7th Cir.1985) (ordinance limiting hours of solicitation held invalid) *with City of Watseka v. Illinois Public Action Council*, 796 F.2d 1547 (7th Cir.1986) (conducting *de novo* analysis of validity of similar ordinance). If the court properly may inquire into whether a change has occurred in the factual basis upon which the constitutionality of a statute depends, then surely an inquiry into the existence of a particular state of facts assumed but never demonstrated is at least equally proper. To this court's knowledge, it is the first ever to examine a parental notification or consent substitute statute in actual operation. *See, e.g., Akron* 462 U.S. 425, 103 S.Ct. at 2489 (enforcement of ordinance enjoined before its effective date); *Planned Parenthood Ass'n. of Kansas City v. Ashcroft*, 483 F.Supp. 679, 683 (W.D.Mo.1980) (statute at issue in *Planned Parenthood Ass'n. v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733, enjoined on day after becoming effective); *Bellotti II*, 443 U.S. at 645 n. 25, 99 S.Ct. at 3049 n. 25 (because appellees successfully sought to enjoin Massachusetts from putting statute into effect, there existed an "absence of any evidence as to the operation of judicial proceedings under § 12s."). Initiation of the factual inquiry mandated by the *Carolene Products* court lies squarely within the province of a federal district court. Therefore, this court heard testimony and has made findings of fact with respect to plaintiffs' allegation that Minn.Stat. § 144.343(2)–(7) is not rationally related to the State's asserted interests.

Plaintiffs' as applied challenge to the constitutionality of Minn.Stat. § 144.343(2)–(7) proceeded at trial on two levels. Plaintiffs' more limited challenge attacked the sufficiency of Minnesota's compliance with the *Bellotti II* guidelines for establishing an alternative procedure whereby authorization for the abortion can be obtained. *See Bellotti II*, 443 U.S. at 643–44, 99 S.Ct. at 3048. Plaintiffs' broader challenge attacked the assumption, implicit in the *Bellotti II* and *Ashcroft* decisions, that a notification or consent requirement imposed in conjunction with an appropriate alternative bypass procedure would serve the State's interest in protecting pregnant minors without unduly burdening the right of mature or best interests minors to obtain an abortion.

The bulk of the testimony at trial related to whether requiring pregnant minors either to notify their parents of their desire to terminate their pregnancies or to go to court to obtain a waiver of the notification requirement actually furthers the State's interest in protecting pregnant minors. The court heard testimony of at least 37 witnesses who spoke to this issue. Only two of these witnesses related facts and expressed opinions from which a court could draw a reasonable inference that the statute does young women more good than harm. Neither of these witnesses, Dr. Vincent Rue or Dr. Richard T.F. Schmidt, has any direct contact with minors affected by

Minn.Stat. § 144.343(2)–(7). Neither witness counsels minors on a regular basis concerning the decision whether to terminate a pregnancy, neither witness performs abortions, and neither witness sees minors who have had abortions on a regular basis.

Of the remaining witnesses who spoke to the issue whether Minn.Stat. § 144.343 effectuates the State's interest in protecting pregnant minors, all but four of these are personally involved in the statute's implementation in Minnesota. They are judges, public defenders, guardians ad litem, and clinic counselors. None of these witnesses testified that the statute has a beneficial effect upon the minors whom it affects. Some testified the law has a negligible affect upon intra-family communication and upon the minors' decision-making process. Others testified the statute has a deleterious affect on the well-being of the minors to whom it applies because it increases the stress attendant to the abortion decision without creating any corresponding benefit. Thus five weeks of trial have produced no factual basis upon which this court can find that Minn.Stat. § 144.343(2)–(7) on the whole furthers in any meaningful way the state's interest in protecting pregnant minors or assuring family integrity.

The court has considered the possibility that the statute's existence encourages immature, non-best interest minors to tell their parents, and that this intangible effect is not amenable to proof at trial. The court does not believe this to be the case. First, several witnesses who testified at trial were involved in providing abortions to minors both before and after the enactment of Minn.Stat. § 144.343(2)–(7). These witnesses could have testified as to a change in the level of parental participation occurring at about the time of the statute's effective date. Although these and other witnesses testified that a sizable proportion of minors seeking an abortion in Minnesota voluntarily notify at least one parent of their intention, none testified that this proportion changed at or around the effective date of the Minnesota parental notification law.

Furthermore, the testimony indicates that the sort of independent self-assessment by the minor of her own maturity suggested by this scenerio actually does not occur as a result of the statute. Although the major abortion providers in Minnesota inquire into a minor's maturity in the course of the informed consent process, abortion providers do not decline to assist minors because of their immaturity with any frequency. To the contrary, the testimony revealed the major providers tend to resolve any doubts as to a minor's maturity by referring her to the judicial bypass system. These minors are almost universally successful in obtaining judicial waivers. Thus there appears to be little self-selection among those minors who come to the clinics initially without both parents. Instead, any self-selection as to maturity occurring among pregnant minors appears to be a result of the natural maturation process, rather than an effect of Minn.Stat. § 144.343(2)–(7). As described in finding of fact number 65, the desire on the part of minors to retain their privacy with respect to the abortion decision is, at least in part, a result of the maturation process. Therefore, it does not appear Minn.Stat. § 144.343(2)–(7) has any greater beneficial effect upon immature minors than it does upon mature minors and minors whose best interests are not served by notification.

In view of the foregoing, the court finds as a matter of fact that Minn.Stat. § 144.343(2)–(7) fails to serve the State's asserted interest in fostering intra-family communication and protecting pregnant minors. This is not a case in which the State merely has failed to demonstrate that the challenged statute employs the alternative means of effectuating its interest that is least burdensome upon the rights of the affected individuals. *See Indiana Planned Parenthood Affiliates Ass'n, Inc. v. Pearson,* 716 F.2d 1127, 1134 (7th Cir. 1983) (state is not constitutionally required to provide the least burdensome alternative to notification.). Similarly, this is not a case in which the legislature has utilized a yardstick that is imprecise or even unjust

in particular cases. *See H.L. v. Matheson,* 450 U.S. 398, 425, 101 S.Ct. 1164, 1179, 67 L.Ed.2d 388 (1981) (Stevens, J., concurring) (over-inclusiveness of parental-notice requirement does not undercut its validity). Instead, Minn.Stat. § 144.343(2)–(7) imposes the substantial burden of obtaining a judicial waiver of the parental notification requirement upon a group of minors composed almost entirely of either mature minors or minors whose best interests are not served by notification. This substantial burden is not justified by the state's interests in encouraging intra-family communication and protecting immature minors because Minn.Stat. § 144.343(2)–(7) fails to further either of those interests in any meaningful way. When, as here, the state's asserted interest fails to justify the burden imposed upon pregnant minors by an abortion regulation, the Supreme Court has invalidated such regulations as unduly burdensome upon the rights of pregnant minors. *Bellotti II* 443 U.S. 622, 651, 99 S.Ct. 3035, 3052, 61 L.Ed.2d 797 (1979); *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 75, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976).

This court does not, however, write on a clean slate in determining the constitutionality of Minnesota's parental notification statute. The Supreme Court carefully delineated the elements of the alternative procedure states must employ if they wish to require parental consent or notification prior to abortion. *Bellotti II,* 443 U.S. at 643–44, 99 S.Ct. at 3048. Although the Court's discussion of the necessary alternative procedure appears in a plurality opinion and at least arguably was unnecessary to the decision in the *Bellotti II* case, the Supreme Court left no doubt as to its commitment to the *Bellotti II* procedure in *Planned Parenthood Ass'n. v. Ashcroft,* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). Noting its statement in *Akron* that

the relevant legal standards with respect to parental-consent requirements are not in dispute, 462 U.S. at 439, 103 S.Ct. at 2497, the Court treated a challenge to the constitutionality of Missouri's consent/bypass statute as an issue purely of statutory construction. *Ashcroft,* 462 U.S. at 491, 103 S.Ct. at 2525. Because the Missouri statute at issue could fairly be construed to comply with the *Bellotti II* requirements, it avoided any constitutional infirmities. *Id.* at 493, 103 S.Ct. at 2526.

Because no court has had occasion to consider the actual effect of a consent/bypass or notification/bypass statute in operation, plaintiffs contend the issue now before this court is far more complex than the statutory interpretation issue addressed by the *Ashcroft* court. Indeed, it appears to this court that the prophecy with which Mr. Justice Stevens closed his concurrence in *Bellotti II* is fulfilled.[1] Nevertheless, this court is bound by applicable Supreme Court precedent. *E.g., Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983); *Jaffree v. Board of School Commissioners,* 459 U.S. 1314, 103 S.Ct. 842, 74 L.Ed.2d 924 (Powell, Circuit Justice 1983). This court has made factual findings as to the effect of Minnesota's parental notification law as it affected the minors to whom it applied between its effective date in 1981 and trial in 1986. Were this court writing on a clean slate, it could not uphold the constitutionality of Minn.Stat. § 144.343(2)–(7) under the intermediate scrutiny appropriate in challenges to regulations that burden the fundamental rights of minors. But it is not this court's place to determine the assumptions upon which the Supreme Court based its holdings in *Bellotti II* and *Ashcroft.* Nor is it this court's place to determine whether the facts actually demonstrated at trial comport or conflict with any assumptions the

---

**1.** In arguing that the *Bellotti II* case presented the Supreme Court no occasion to render an advisory opinion on the constitutionality of the alternative procedure recommended in Justice Powell's plurality opinion, Justice Stevens predicted "a real statute—rather than a mere outline of a possible statute—and a real case or controversy may well present questions that appear quite different from the hypothetical questions Justice Powell has elected to address." 443 U.S. at 656 n. 4, 99 S.Ct. at 3054 n. 4 (Stevens, J., concurring).

Supreme Court may have made. The Supreme Court directs that this court's inquiry be limited instead to an issue purely of statutory construction: whether Minnesota provides a judicial alternative that is consistent with established legal standards. *Ashcroft*, 462 U.S. at 491–92, 103 S.Ct. at 2525.

Minnesota Statute § 144.343(2)–(7) satisfies these legal standards. The court has found that Minn.Stat. § 144.343(6) correctly directs courts hearing bypass petitions to conduct the inquiry required by the *Bellotti II* court. Although the language of the Minnesota statute with respect to maturity varies slightly from that of the *Bellotti II* decision, the requirement that the woman be "mature and capable of giving informed consent to the proposed abortion" is the functional and legal equivalent of the Supreme Court's requirement that the minor be "mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes." *See Bellotti II*, 443 U.S. at 643, 99 S.Ct. at 3048.

Arguably, however, the statute's requirement that the court inquire in the case of an immature minor "whether the performance of an abortion upon her without notification of her parents, guardian, or conservator would be in her best interests" differs from the Court's inquiry whether "the desired abortion would be in her best interests. *See id.* at 644, 99 S.Ct. at 3048. Indeed, testimony indicates that some Minnesota courts consider whether the abortion itself is in the minor's best interests, while others examine whether avoiding parental involvement in the minor's decision, whatever it may be, is in the minor's best interests. This court, however, perceives that the former inquiry imposes the greater burden upon the minor in terms of what she must demonstrate before proceeding without involving her parents. Because the Supreme Court's language approves the imposition of this more restrictive standard, this court concludes that the practice of some Minnesota courts of interpreting Minn.Stat. § 144.343(6) to require a less intrusive and less burdensome inquiry does

not violate the legal standards set forth in *Bellotti II* and approved in *Ashcroft*.

The court further finds that judges who hear the bypass petitions in Minnesota faithfully apply the standards set forth in Minn.Stat. § 144.343(6), and those judges who consider themselves unable to faithfully apply the standard have consistently refused to hear bypass petitions. Furthermore, the court finds that Minnesota courts have established procedures to assure the minors' anonymity, and to expedite both the initial hearing and any subsequent appeal. Finally, the court finds that the delays which do attend the bypass proceedings in practice, although burdensome to minor petitioners, do not reflect a systemic failure to provide a judicial bypass option in the most expeditious, practicable manner. Accordingly, the court concludes that the judicial bypass procedure created by Minn. Stat. § 144.343(6), as presently executed by Minnesota courts and the other offices that participate in the bypass proceedings, complies with the procedural requirements set forth in *Bellotti II* and approved in *Ashcroft*. Therefore, the court must reject plaintiffs' challenge to Minnesota's notification/bypass requirement as a whole.

IV. *Two Parent Notification Requirement*

Subdivision 3 of Minnesota Statute § 144.343 identifies the individuals entitled to notification as "both parents of the pregnant woman if they are both living, one parent of the woman if only one is living or if the second cannot be located through reasonably diligent effort, or the guardian or conservator if the pregnant woman has one." Plaintiffs contend the statute's two parent notice requirement unduly burdens the exercise by minors of the right to seek an abortion. The court finds that this requirement places a significant burden upon pregnant minors who do not live with both parents. Particularly in these cases, notification of an abusive, or even a disinterested, absent parent has the effect of reintroducing that parent's disruptive or unhelpful participation into the family at a time of

acute stress. Similarly, the two parent notification requirement places a significant obstacle in the path of minors in two parent homes who voluntarily have consulted with one parent but not with the other out of fear of psychological, sexual, or physical abuse toward either the minor or the notified parent. In either case, the alternative of going to court to seek authorization to proceed without notifying the second parent introduces a traumatic distraction into her relationship with the parent whom the minor has notified. The anxiety attending either option tends to interfere with and burden the parent-child communication the minor voluntarily initiated with the custodial parent.

The State has the burden of demonstrating that its interest in encouraging parental consultation justifies the burden imposed upon pregnant minors by the statute's two parent notification requirement. *See, e.g., Carey v. Population Services International*, 431 U.S. 678, 696 n. 22, 97 S.Ct. 2010, 2022 n. 22, 52 L.Ed.2d 675 (1977); *Pearson*, 716 F.2d at 1133. The Supreme Court has concluded that the requirement of obtaining both parents' consent does not unconstitutionally burden a minor's right to seek an abortion "[a]t least when the parents are together and the pregnant minor is living at home." *Bellotti II*, 443 U.S. at 649, 99 S.Ct. at 3051. When all three live together, both the father and mother have an interest—one normally supportive—in helping to determine the course that is in the best interests of the daughter. *Id.* This court concludes, however, that a regulation requiring notification of both parents even when the nuclear family unit either has broken apart or never formed is not reasonably designed to further the State's interest in protecting pregnant minors.

To the contrary, the court finds that the regulation adversely affects communication voluntarily initiated with one parent in a large number of cases. Indeed, 20 to 25% of minors seeking judicial authorization to proceed with an abortion without parental notification are accompanied to court by one parent, or at least have obtained the approval of one parent. In these cases the necessity either to notify the second parent despite the agreement of both the minor and the notified parent that such notification is undesirable, or to obtain a judicial waiver of the notification requirement, distracts the minor and her parent and disrupts their communication. Thus the need to notify the second parent or to make a burdensome court appearance actively interferes with the parent-child communication voluntarily initiated by the child, communication assertedly at the heart of the State's purpose in requiring notification of both parents. In these cases, requiring notification of both parents affirmatively discourages parent-child communication. Thus the court concludes that this requirement fails to further the State's interest. Because "state restrictions inhibiting privacy rights of minors are valid only if they serve any significant state interest," *Carey v. Population Services*, 431 U.S. at 693, 97 S.Ct. at 2020; *Danforth*, 428 U.S. at 75, 96 S.Ct. at 2843, the court must enjoin defendants from enforcing the two parent notification requirement of Minn.Stat. § 144.343.

## V. *Waiting Period*

Minnesota Statute § 144.343(2) prohibits performing an abortion upon an unemancipated minor until at least 48 hours after written notice of the pending operation has been delivered to the minor's parents. The notice may be delivered personally to the parent by the physician or his agent, or notice may be made by certified mail addressed to the parent at his usual place of abode, with constructive delivery occurring at 12:00 noon on the next day upon which regular mail delivery takes place, subsequent to mailing. Thus minors in Minnesota who choose to notify their parents in writing of their determination to obtain an abortion must wait at least 48 hours, and more commonly approximately 72 hours, between initiating the notification process and the abortion itself.

Lower courts have split on the issue of the constitutionality of mandatory waiting periods imposed upon minor women seek-

ing abortion. Some courts, including this one, have found that a reasonable period of notice is permissible to allow parents to aid, counsel, advise, and assist their minor daughter in connection with the determination to undergo abortion or to provide the physician with information which may be relevant to the medical judgments involved. *Akron Center for Reproductive Health v. Rosen*, 633 F.Supp. 1123, 1138–39 (N.D. Ohio 1986); *Hodgson v. Minnesota*, Civ. No. 3–81–538, slip op. at 5 (D.Minn. March 22, 1982). The *Rosen* court concluded that the notification requirement which the Supreme Court explicitly upheld for immature minors in *Matheson* would be an empty formalism with no practical effect if the abortion could proceed before parental consultation could take place. 633 F.Supp. at 1139.

The Seventh Circuit Court of Appeals has invalidated an Illinois statute requiring pregnant minors to wait 24 hours between notifying their parents and obtaining an abortion. *Zbaraz v. Hartigan*, 763 F.2d 1532 (7th Cir.1985), *appeal docketed*, No. 85–673 (U.S. Oct. 16, 1985). The *Zbaraz* court based its decision upon its conclusion that the mandatory waiting period placed a direct and substantial burden on women who seek to obtain an abortion, and that the waiting requirement did not significantly further the State's interest in promoting consultation when combined with the notification requirement because the notification requirement itself adequately promotes the State's interest. 763 F.2d at 1537–38. The court further concluded that the statutory alternatives to the mandatory waiting period, such as having both parents accompany the minor to the place the abortion will be performed or having both parents submit signed, notarized statements indicating they have been notified, do not redeem the statute. *Id.* at 1538. The Seventh Circuit based its decision in large part upon its prior decision in *Indiana Planned Parenthood Affiliates Ass'n, Inc. v. Pearson*, 716 F.2d 1127 (7th Cir.1983). There the court upheld a mandatory waiting period to the extent it delayed the abortion for the purpose of effecting constructive notice. *Id.*

at 1142–43. Requiring delay after notification has been effected, however, is impermissible. *Id.; see Zbaraz*, 763 F.2d at 1538.

The Eighth Circuit Court of Appeals three times has affirmed district court decisions that a mandatory 48 hour waiting period, applicable to adult and minor women alike, is unconstitutional. *See Women's Services, P.C. v. Thone*, 690 F.2d 667, 668–69 (8th Cir.1982), *vacated and remanded for further consideration sub nom. Kerrey v. Women's Services, P.C.*, 462 U.S. 1126, 103 S.Ct. 3102, 77 L.Ed.2d 1358 (1983); *Planned Parenthood Ass'n. of Kansas City v. Ashcroft*, 655 F.2d 848, 866 (8th Cir.1981), *aff'd.* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983); *Women's Services, P.C. v. Thone*, 636 F.2d 206, 210 (8th Cir.1980), *vacated for further consideration sub nom. Thone v. Women's Services, P.C.*, 452 U.S. 911, 101 S.Ct. 3043, 69 L.Ed.2d 414 (1981). The state of Missouri did not appeal the Eighth Circuit's decision in *Ashcroft* invalidating the statute's 48 hour waiting period.

This court agrees with the district court for the Northern District of Ohio that a notification requirement would be an empty formalism without practical effect if the abortion could proceed before the parental consultation could take place. *See Rosen*, 633 F.Supp. at 1139. However, the waiting period must effectuate actual consultation without unduly burdening the opportunity of pregnant minors to obtain an abortion. In view of the logistical obstacles facing Minnesota women who live in counties without a regular provider of abortion services, the court believes a 48 hour waiting period is excessively long. Travel to an abortion provider, particularly in winter from a rural area in Minnesota, can be a very burdensome undertaking. A requirement that a minor either bear this burden twice or spend up to three additional days in a city distant from her home cannot be justified by the State's interests in encouraging parental consultation, because a shorter waiting period would effectuate that interest as completely. Therefore, the

court concludes that if a minor chooses to notify her parent by certified mail as provided in Minn.Stat. § 144.343(2)(b), the State properly may deem delivery to occur at 12:00 noon on the next day on which regular mail delivery takes place, subsequent to mailing. The State further may impose some reasonable waiting period subsequent to delivery of notification during which consultation may occur. Under conditions presently existing in Minnesota, however, 48 hours is an unreasonable waiting period. Therefore, the court will enjoin defendants from enforcing the 48 hour waiting period imposed by Minn.Stat. § 144.343(2).

### VI. *Severability*

Defendants contend that the two parent notification requirement and the 48 hour waiting period, which the court today holds unconstitutional, should be severed from the remainder of Minn.Stat. § 144.343(2)–(7).

Subdivision 7 of Minnesota's parental notification statute provides:

> If any provision, word, phrase or clause of this section or the application thereof to any person or circumstance shall be held invalid, such invalidity shall not affect the provisions, words, phrases, clauses or application of this section which can be given effect without the invalid provision, word, phrase, clause or application, and to this end the provisions, words, phrases, and clauses of this section are declared to be severable.

This language clearly evinces the legislature's intent that any unconstitutional portions of Minnesota's parental notification statute amenable to severance should be severed.

■■■ Subdivision 7 creates a "presumption of divisibility" and places "the burden ... on the litigant who would escape its operation." *Carter v. Carter Co.*, 298 U.S. 238, 335, 56 S.Ct. 855, 883, 80 L.Ed. 1160 (1936) (Cardozo, J.). *See Regan v. Time, Inc.*, 468 U.S. 641, 643, 104 S.Ct. 3262, 3263, 82 L.Ed.2d 487 (1984); *Immigration and Naturalization Service v. Chadha*,

462 U.S. 919, 932, 103 S.Ct. 2764, 2774, 77 L.Ed.2d 317 (1983). Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law. *See Regan* 468 U.S. at 653, 104 S.Ct. at 3269; *Chadha*, 462 U.S. at 932, 103 S.Ct. at 2774. Severance is improper, however, if the offending language is "inseparably intertwined" within a subsection of the law. *Women's Services, P.C. v. Thone*, 636 F.2d 206, 210 (8th Cir.1980), *vacated for further consideration on other grounds sub nom. Thone v. Women's Services P.C.*, 452 U.S. 911, 101 S.Ct. 3043, 69 L.Ed.2d 414 (1981).

■■■ The 48 hour waiting period in Minn.Stat. § 144.343(2)–(7) is severable from the remainder of the statute. Excising the words "at least 48 hours after" from subdivision 2 does not disable the statute from reasonably effectuating the legislature's intent. Accordingly, the court holds that this language is severable from the remainder of Minn.Stat. § 144.343. *See Zbaraz v. Hartigan*, 763 F.2d 1532, 1545 (7th Cir.1985), *appeal docketed*, No. 85–673 (U.S. Oct. 16, 1985).

■■■ The language of subdivision 3 defining "parent" as "both parents of the pregnant woman if they are both living, one parent of the pregnant woman if only one is living or if the second cannot be located through reasonably diligent effort, or the guardian or conservator if the pregnant woman has one" is inseparably intertwined within Minn.Stat. § 144.343(2)–(7). The Minnesota legislature would not have enacted a statute requiring notification of a minor's parents prior to the abortion without identifying the individuals entitled to such notice. More importantly, the remainder of the statute cannot be given effect without the offending language. *See* Minn.Stat. § 144.343(7).

In addition, this court is ill-situated to determine what alternative definition the legislature would employ to remedy the constitutional infirmity identified in this de-

cision. For example, the legislature may determine that requiring notice only to one parent is the functional equivalent of requiring notice to both in families enjoying healthy communication, while requiring notice only to one parent permits the notified parent in an intact but dysfunctional family to exercise his or her judgment concerning the wisdom of notifying the other parent. Alternatively, the legislature may determine that notification of both parents is appropriate when the parents are together and the pregnant minor is living at home. *See Bellotti II,* 443 U.S. at 649, 99 S.Ct. at 3051. Other options also may suggest themselves to the legislature. Any of these choices, however, would leave Minn. Stat. § 144.343(2)–(7) with little resemblance to the program actually intended by the Minnesota legislature. *See Thornburgh v. American College of Obstetricians and Gynecologists,* — U.S. —, —, 106 S.Ct. 2169, 2181, 90 L.Ed.2d 779 (1986); *City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 472, 103 S.Ct. 2481, 2515, 76 L.Ed.2d 687 (1983) (O'Connor, J., dissenting). Therefore, the definition of parent contained in Minn.Stat. § 144.343(3) is not severable from the remainder of the statute. The court must enjoin defendants from enforcing Minn. Stat. § 144.343(2)–(7) in its entirety.

## ORDER

Upon the foregoing, the evidence presented at trial, the submissions and arguments of the parties, and the record as presently constituted,

**IT IS ORDERED** That Minn.Stat. § 144.343(2)–(7) be and the same hereby is declared unconstitutional.

**IT IS FURTHER ORDERED** That the Clerk enter judgment as follows:

**IT IS ORDERED, ADJUDGED, AND DECREED** That Minn.Stat. § 144.343(2)–(7) is unconstitutional.

**IT IS FURTHER ORDERED** That defendants be and the same hereby are permanently enjoined from enforcing the provisions of Minn.Stat. § 144.343(2)–(7).

**IT IS FINALLY ORDERED** That the following injunction shall issue without security:

**IT IS ORDERED, ADJUDGED, AND DECREED** That defendants are permanently enjoined from enforcing the provisions of Minn.Stat. § 144.343(2)–(7).

APPENDIX

Petitions
Abortion Notification Statute
Minnesota Statutes § 144.343, Subd. 6,
1981 Supplement
August 1, 1981 to March 1, 1986

| Judicial District | No. of Counties | No. of Petitions Filed | No. of Petitions Granted | No. of Petitions Withdrawn | No. of Petitions Denied | No. of Petitions Appealed | No. of Petitions Affirmed | No. of Petitions Reversed |
|---|---|---|---|---|---|---|---|---|
| 1. | 7 | 78 | 77 | 1 | | | | |
| 2. | 1 | 793 | 793 | | | | | |
| 3. | 11 | 52 | 51 | | 1 | | | |
| 4. | 1 | 2314 | 2311 | | 3 | | | |
| 5. | 15 | 4 | 1 | 1 | 2 | 1 | 1 | |
| 6. | 4 | 279 | 278 | | 1 | | | |
| 7. | 10 | 7 | 5 | 2 | | | | |
| 8. | 13 | 2 | 2 | | | | | |
| 9. | 17 | 6 | 6 | | | | | |
| 10. | 8 | 38 | 34 | 2 | 2 | | | |
| | 87 | 3,573 | 3558 | 6 | 9 | 1 | 1 | |