**PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS, et al., Plaintiffs, Appellants,**

v.

**Francis X. BELLOTTI, etc., et al., Defendants, Appellees.**

No. 88–1221.

United States Court of Appeals, First Circuit.

Feb. 7, 1989.

Rehearing and Rehearing En Banc Denied March 14, 1989.

John H. Henn with whom Foley, Hoag & Eliot, Boston, Mass., and Richard H. Pildes, Washington, D.C., were on brief for plaintiffs, appellants.

Carl Valvo, Asst. Atty. Gen., with whom Gerald Fitzgerald, First Asst. Atty. Gen., William L. Pardee, and Mary Connaughton, Asst. Attys. Gen., Boston, Mass., were on brief for defendants, appellees.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

**460**

COFFIN, Circuit Judge.

This is an appeal from a decision of the district court for the District of Massachusetts to abstain, on *Burford*[1] and *Younger*[2] grounds, from further entertaining a suit challenging the constitutionality of a Massachusetts statute, as actually implemented, that regulates abortions. The statute requires a minor seeking an abortion to obtain parental consent or to persuade a justice of the superior court that she is either mature enough to make an informed decision to have an abortion or that such an operation is in her best interests.[3]

## I.

Plaintiffs' first challenge to section 12S of M.G.L. ch. 112 began in 1978, when they sought to enjoin the original version of the statute. After certification to the Massachusetts Supreme Judicial Court, the United States Supreme Court struck the provisions that required parental notice of a minor's decision to seek an abortion, and that granted state judges the authority to withhold consent even for minors sufficiently mature to make an informed decision. *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II*). Massachusetts amended § 12S to its current form, and plaintiffs renewed their challenge. We discuss in some detail the relevant history of this second litigation, now in its ninth year.

1. In June of 1980, plaintiffs Planned Parenthood League of Massachusetts (PPLM), a nonprofit abortion counselling and referral foundation, a medical clinic, a physician, and an unmarried pregnant minor, on their own behalf and on behalf of classes certified by the district court (all hereinafter simply PPLM), brought suit challenging the facial constitutionality of amended § 12S. The original defendants were the then Attorney General of Massachusetts, Francis X. Bellotti, the Commissioner of Public Health, and the Suffolk County District Attorney, representing prosecutors as a class. The district court denied a motion for preliminary injunction that would have prevented the implementation of § 12S. *Planned Parenthood League v. Bellotti*, 499 F.Supp. 215 (D.Mass.1980).

2. In 1981, we reversed the district court's decision not to preliminarily enjoin the requirements that a minor sign a consent form that included a description of the fetus and that she wait for 24 hours after signing the form before having an abortion. We directed that a preliminary injunction issue. We affirmed the court's refusal to enjoin the provisions of § 12S requiring parental consent or judicial bypass authorization for abortions, stating that "on a record undeveloped as to the actual operation of the judicial approval procedure, we are not prepared to hold that its effects will be so burdensome as to deny due process of law to minors seeking to use it." *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1011 (1st Cir.1981) (footnote omitted).[4]

3. On April 17, 1981, PPLM instituted suit in the Massachusetts Supreme Judicial Court against the same defendants, facially

1. *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

2. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.ED.2d 669 (1971).

3. Mass.Gen.Laws Ann. ch. 112, § 12S (West 1983), enacted on June 5, 1980, provides in relevant part as follows:
   If a pregnant woman is less than eighteen years of age and has not married, a physician shall not perform an abortion upon her unless he first obtains both the consent of the pregnant woman and that of her parents, except as hereinafter provided.... If a pregnant woman less than eighteen years of age has not married and if one or both of her parents or

guardians refuse to consent to the performance of an abortion, or if she elects not to seek the consent of one or both of her parents or guardians, a judge of the superior court department of the trial court shall, upon petition, or motion, and after an appropriate hearing, authorize a physician to perform the abortion if said judge determines that the pregnant woman is mature and capable of giving informed consent to the proposed abortion or, if said judge determines that she is not mature, that the performance of an abortion upon her would be in her best interests.

4. Our decision issued on February 9, 1981; rehearing was denied on April 15, 1981.

challenging § 12S on state grounds, Articles I, II, X and XVI of the Massachusetts Declaration of Rights. Injunctive relief was denied on April 22 and § 12S became effective on April 23, 1981. On May 19, 1981, PPLM amended its state complaint to add an as-applied basis for the challenge and a reques that the Supreme Judicial Court invoke its general superintendency power over implementation of the statute.

4. On June 16, 1981, Justice Liacos of the Supreme Judicial Court, acting as a single justice, propounded guidelines for handling § 12S proceedings in the superior court, supplementary to the earlier Standing Order No. 12–80 of that court. (We had earlier reproduced that standing order in an appendix to our opinion. 641 F.2d at 1025–26.) The state case was transferred to Suffolk Superior Court. Under an agreed procedure in an order issued by Chief Justice Morse of that court, statistical records on § 12S cases are maintained and made available to PPLM. They reflect the number of petitions processed, the length of time involved, the number of trips a minor must make to the courthouse, and other facts concerning § 12S cases. Very little activity has since taken place in this case, which is now on the superior court's suspended docket.

5. After more than two years, action resumed in federal district court with a status conference in December, 1983, at which PPLM indicated its intent to change the focus to an as-applied challenge.[5] Defendants then moved for a more definite statement in February, 1984, and suggested an amended complaint. On March 26, 1984, PPLM filed a more definite statement, contending that "the administration and application ... of the parental/judicial consent requirements of § 12S ... has violated [plaintiff's due process rights] ... in that the procedures in fact afforded ... constitute an undue burden...."

6. Shortly thereafter, PPLM, in April, 1984, moved to amend the federal complaint, by adding as defendants the Administrative Chief Justice of the trial court of Massachusetts, the Chief Justice of the superior court department of the trial court, and the clerk of the Suffolk division of that department. The Commonwealth had earlier suggested making them parties. PPLM explained the grounds by saying that the challenge focuses "on the actual workings of the statute in practice as it is administered and applied by judges and clerks." PPLM then referred to an attached article by Patricia Donovan in the November/December 1983 issue of Family Planning Perspectives, describing the operation of the judicial bypass statutes in Massachusetts, Minnesota, and Rhode Island, entitled "Judging Teenagers: How Minors Fare When They Seek Court–Authorized Abortions."[6] PPLM then asserted that it relied "in part on the actions of those judges and clerks, and the relief accorded herein may include specific relief against judges as a class and clerks as a class."

7. On June 29, 1984, defendants moved to dismiss the action against the two judicial defendant classes, characterizing the amended complaint as a "dangerous challenge to the core of state governance," in which the district court is asked to "sit in

---

**5.** The district court recognized the conversion of the case into an as-applied challenge, referring to it as such in its Memorandum and Order of July 11, 1986.

**6.** In this article the author makes the following points concerning the operation of the Massachusetts statute:

1) of 62 superior court judges, 10 have recused themselves and approximately one fourth of the remainder are avoided for reasons of hostility; sometimes many of the latter are sitting in the same county;

2) courts are not open evenings or on weekends; the difficulty in scheduling particular judges requires two or more trips by a minor,

with delays of two to four days in obtaining an abortion being common;

3) judicial authorizations are sought by few minority applicants;

4) any decrease in Massachusetts abortions seems to be accounted for by visits to clinics in neighboring New Hampshire and Maine;

5) consultation with parents does not seem to be either stimulated by § 12S or helpful;

6) the hearings are often rituals, the minors being well coached, and "maturity" being difficult to judge in a brief session;

7) of 1,571 applications for abortion between 1981 and 1983, only 7 were denied and 5 of these denials were overturned on appeal.

judgment on the manner in which individual state judges are deciding particular section 12S cases," with "the spectacle of state judges being cross-examined as to their reasons not only for deciding cases but even for their most casual trial utterances and gestures" and the possibility of a federal judge being asked to issue "detailed rules of conduct" for state judges. In their brief, the issue was starkly described: "Can a federal court ever sit as a superjudge over an entire state system?" Then followed the elaboration of five bases for dismissing the complaint as to the judges: (1) no complaint was made of the actions, individual or supervisory, of the two judicial defendants; (2) there is no case or controversy, there being no basis for monetary relief and no real and immediate threat to plaintiffs; (3) there is both an adequate and a superior remedy at law within the Massachusetts court system; (4) there should be abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), or *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); and (5) dismissal can rest on *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), to avoid duplicative litigation.

8. On August 22, 1984, PPLM filed its opposition, asserting that it sought only to strike down a statute being implemented in an unconstitutional manner by enjoining its enforcement, not an injunction against violation of individual minors' civil rights or an injunction ordering state judges and clerks to do better. It contemplated proving its case by the statistical data being gathered under the order of Chief Justice Morse, by transcripts, and by testimony from a lawyers' referral panel supplying counsel to § 12S petitioners. The opposition proceeded to contest each of the five bases of dismissal asserted by the state. With this opposition was filed an affidavit of PPLM's counsel asserting that its investigation had developed information concerning the need for the volunteer legal panel, statistical data on abortions and births, statistical data on the processing of § 12S petitions, data as to the ages of minor petitioners, information on recusals, information reported by the volunteer legal panel concerning hostile judges, data on out-of-state clinics performing abortions on Massachusetts minors, data on court caseloads, information on psychological trauma, and other impacts on minors undergoing § 12S proceedings.

## II.

On February 11, 1985, the district court issued its opinion dismissing the complaint as to the "judicial defendants," the two administrative justices of the superior court and the Suffolk County clerk. *Planned Parenthood League v. Bellotti*, 608 F.Supp. 800 (D.Mass.1985). The court observed that all of defendants' theories supporting dismissal centered on the foundation question: "whether a federal court may 'sit as a superjudge over an entire state judicial system?'" *Id.* at 803. The court noted PPLM's argument that it did not contemplate specific injunctive relief against individual state judges, but rather "a declaration that the judicial court system ... is unconstitutional as applied" and "injunctive relief against class defendants responsible for enforcing Section 12S." *Id.* at 804.

The court went on to say that its concern with federalism issues was not "determined by whether or not injunctive relief will issue against a state judge." *Id.* The court deemed that a federalism concern was triggered not by the relief sought but by the nature of PPLM's attack against "the *process* through which this state statute is administered." *Id.* at 805 (emphasis in original). Citing *Pulliam v. Allen*, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984), it characterized PPLM's objective as a "'federal intrusion into the state process.'" 608 F.Supp. at 805.

The court found comity concerns at two levels. First, noting the particularly strong interest states have in the integrity of their own judicial systems, *id.* at 806, the court saw the subject matter of the suit as the manner in which superior court judges and clerks process § 12S petitioners, *i.e.*, an action directed at "maladminis-

tration." *Id.* at 807, 809–10. It viewed the focus of the suit as internal operations, raising issues such as "which superior court judges are 'defacto unavailable' to hear minors' abortion petitions and how long a clerk should take to process a Section 12S petition." *Id.* at 810. Therefore, it reasoned, the Supreme Judicial Court, with its own supervisory power, should hear the evidence and possibly take remedial measures.

The court's second level of inquiry arose from PPLM's institution of what it called "an ongoing parallel state proceeding." *Id.* at 805. It noted first that federalism requires "that federal courts recognize a state judiciary's ability to decide identical issues in an ongoing case in the state system." *Id.* at 806. It then added, obviously aware that PPLM's state suit concerned only state constitutional issues but that amendment was possible, that "[t]here is no question that Planned Parenthood may raise arguments under the federal constitution as well...." *Id.* at 807. The court therefore concluded that *"Burford* abstention is particularly fitting for this case," *id.* at 808, fearing that refusing to abstain "would steer this Court perilously close to 'a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity.' " *Id.* at 812 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 501, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974)).

A motion to reconsider by PPLM was denied. Over a year later, on April 4, 1986, the Commonwealth moved to dismiss the complaint against the remaining defendants or, in the alternative, for a protective order barring PPLM from any discovery involving the former judicial defendants. It relied principally on the court's prior decision. PPLM opposed the motion in a lengthy memorandum criticizing the appli-

cation of *Burford* and any blanket prohibition against discovery. Accompanying this was another affidavit of counsel, setting forth the table of contents of a lengthy listing of proposed findings of facts, dated May 16, 1986, compiled after a five-week trial in a similar parental notification/judicial bypass case, *Hodgson v. Minnesota,* 648 F.Supp. 756 (D.Minn.1986).[7] In that trial, the six Minnesota judges who had heard 90 percent of the judicial bypass cases testified, none identifying any positive effects of the law. Counsel averred that PPLM's evidence of delay would be in the form of statistical data, and evidence of the number of judges actually available, including evidence that plaintiffs "are reasonable in declining to appear before a small number of additional judges." No discovery from judges was said to be needed.

On July 11, 1986, the district court issued a second opinion, recapping the substance of its first opinion. It reasoned that pursuing the litigation against the non-judicial defendants would open the door to the "same intrusive factual record," and that PPLM envisioned "a much more detailed administrative order" than a simple declaration of unconstitutionality. It saw the issues as involving only the internal operations of the state court, and concluded that *Burford* abstention was still the proper course. To this ground of decision it added abstention on the basis of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). It recognized that this was not a typical *Younger* case, since it was not being asked to interfere with state-initiated judicial proceedings. But the court felt that it was being asked to interfere with state court practices, as in *Parker v. Turner,* 626 F.2d 1 (6th Cir.1980) (affirming district court's abstention where plaintiffs

---

7. The proposed findings, occupying over 139 pages, were wide ranging, including the effect of the law on delay and the dangers of delay, the effect on deterrence, the traumatic effects of the parent notification law, and the lack of any positive contribution to family communication or minors' decisionmaking.

The Minnesota district court eventually held that the parent notification requirement was

unconstitutional and the judicial bypass requirement so interdependent that it, too, must be struck. A panel of the court of appeals affirmed. 827 F.2d 1191 (8th Cir.1987). The decision and opinion were subsequently vacated and withdrawn, and the decision of the district court reversed. 853 F.2d 1452 (8th Cir.1988) (en banc).

sought to compel state judges to afford due process in future contempt proceedings).

### III.

We have set forth in detail the background of claims, party characterizations of claims, amendments, court interpretations of the relief sought and implications thereof, and disavowals and clarifications of PPLM. We have done so because our analysis of what we deem to be the proper approach to abstention can be made only in light of that background in all its confusion, complexity, and stridency.

We begin that analysis by clarifying the issues before us. We view the district court's decision to abstain under *Burford* as implicating three separate comity concerns. First, and most basic, was the concern about the nature of plaintiffs' complaint. The district court was troubled not only by the prospect of an improper remedy, but by what it saw as an entirely improper case, one seeking federal judicial review of the process through which the commonwealth has chosen to administer its statute. The core concern here is a federal court's responsibility to avoid usurping a state's authority to supervise its own administrative body, in this case the state judiciary as it implements regulations of minors' abortions.

Second, the court seemed concerned about the intrusion into the state judiciary that would occur because of the plaintiffs' discovery and other efforts to develop a factual record. Although not expressly stated, we surmise a realistic fear on the court's part that plaintiffs would seek to document their complaints by indiscriminately questioning or subpoenaing Massachusetts judges in pursuit of useful testimony. In the *Hodgson* case in Minnesota, on which plaintiffs relied, judges presented extensive testimony (apparently voluntary) in support of the plaintiffs' case. Third, the court pointed to the ongoing litigation in state court, which it deemed a "parallel" proceeding.

As we did in our recent opinion in *Bath Memorial Hospital v. Maine Health Care Finance Commission*, 853 F.2d 1007, 1009 (1st Cir.1988), we take note of "the Supreme Court's admonition that 'abstention from the exercise of federal jurisdiction is the exception, not the rule,' *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 14 [103 S.Ct. 927, 936, 74 L.Ed.2d 765] (1983) (quoting *Colorado River*, 424 U.S. at 813 [96 S.Ct. at 1244])." Indeed, the exception is further described in *Colorado River* as "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." 424 U.S. at 813, 96 S.Ct. at 1244.

The abstention issue posed here is whether the litigation necessarily implies an involvement in the administration of the internal affairs of the Massachusetts courts so unseemly for a federal court as to encroach on principles of comity and federalism. As we see the issue, the word "necessarily" is of critical importance. It flows from these principles that abstention is the exception, not the rule. This means to us that a federal judge, while being as sensitive to important state interests and as wary of intruding in internal state affairs as was the district court in this case, will also endeavor to see if the legitimate objectives of the litigation can be pursued without treading on those state interests and internal affairs. If they cannot be so pursued, abstention should be invoked; but if the case can so be managed that fears of unseemly intrusion can be dispelled, abstention should be refused.

In short, a federal judge has a difficult institutional role to play. He or she cannot safely base a decision on how either party characterizes a case but must do an independent analysis. Otherwise, abstention decisions could be based on the rhetoric of an advocate rather than on the essential nature of a case. In this case we suspect that this may have happened. In retrospect both sides seem to have contributed. Although PPLM framed its general objectives in conventional terms, alleging that "procedures in fact ... constitute an undue burden" (plaintiffs' more definite statement) and that the challenge "focuses on

the actual workings of the statute in practice as it is administered and applied by judges and clerks" (explanation of grounds for amending complaint), it also held out the possibility of "specific relief against judges as a class and clerks as a class." Although PPLM later, in its motion to reconsider the district court's first opinion, "clarified" its motion to amend by disclaiming any intention to seek equitable relief against judges, this came after defendants' superheated motion to dismiss.

In that motion, the Commonwealth held out the specter of having a federal court determine which state judges were so hostile as to be de facto unavailable, preside over cross-examinations of state judges as to not only their reasons but even "their most casual trial utterances and gestures," and issue "an injunction mandating specific and detailed rules of conduct for Superior Court judges."

In retrospect it would have helped the court to make a sound abstention decision if PPLM had, at the outset of its as-implemented attack, given the court in more revealing terms a clearer idea of what its case would be. Nevertheless, the court had available to it before its first decision indications of the kinds of issues that would be raised and the nature of evidence that would be adduced:

—On the question of delay, the court was aware of the steady accumulation of statistical data on the processing of § 12S petitions, under Chief Justice Morse's order. This would be available to PPLM in the state proceeding; there would seem to be no insuperable obstacle to its availability in the instant case.

—The Donovan article attached to PPLM's memorandum supporting its motion to amend indicated that data was available concerning use of the § 12S procedure by minorities, and the rise in the use of abortion clinics in neighboring states.

—The reservoir of volunteer lawyers secured through the lawyers' referral panel, in addition to minors themselves, was an obvious source of testimony concerning experiences in § 12S proceedings, in-

cluding accessibility, delay, continuances, length, the demeanor of judges, and the trauma of petitioners.

—The statistics on the number of § 12S applications, initial denials, and reversals on appeal seem to be readily available.

■■■ PPLM's opposition to defendants' first motion to dismiss represented that investigation had been made in all of the above areas. Ten supporting exhibits were attached. The kinds of evidence that might be expected in the asserted as-applied constitutional attack were further revealed in PPLM's opposition to defendants' second motion to dismiss, i.e., the proposed findings of fact submitted in the *Hodgson* case.

PPLM's offerings show that its basic objective is to achieve a holding that the Massachusetts § 12S process of obtaining consent for minors' abortions is, in its actual workings, unconstitutional. This remedy is a permissible one to pursue in federal court. Indeed this case is a paradigm of the kind of class action, civil rights case that characterizes our era. Challenging a state's approach to the sensitive question of regulating abortions of minors within the constraints set by the Supreme Court is of the same broad genre of cases as those involving prisoners' rights, public housing, desegregation, and drug testing. In all of these, whenever a federal court finds violations of constitutional rights, whether by individual state officials or by laws and ordinances, state interests are affected. In virtually all such cases, the way in which state courts treat future cases is affected.

If plaintiffs succeed, what will occur is not an ongoing intermeddling with the state judiciary but a prohibition of an unconstitutional process. As we said in *Bath Memorial Hospital*, 853 F.2d at 1013:

The threatened interference [in *Burford* and other such cases] did not consist merely of the threat that the federal court might declare the *entire state system* unconstitutional; that sort of risk is present whenever one attacks a state law on constitutional grounds in a federal court.... Rather, in our view, abstention in the *Burford* line of cases rested upon the threat to the proper administra-

tion of a *constitutional* state regulatory system. The threat was that the federal court might, in the context of the state regulatory scheme, create a parallel, additional, federal 'regulatory review' mechanism, the existence of which would significantly increase the difficulty of administering the state regulatory scheme. What PPLM seeks here is not for the federal court to tinker with Massachusetts' scheme of regulating minors' abortions, but for the court to dismantle it.

We recognize that the parties discuss the possibility that a holding of unconstitutionality could rest on a specific, remediable deficiency. Defendants raise the alarum that this sort of finding might open the door to the imposition of intrusive rules of conduct. Our view, however, is that in such a situation, the defect would be remedied not by the federal court imposing its will but by the Massachusetts legislature itself, which took just such a step in amending § 12S in 1980. 1980 Mass.Acts. ch. 240.

Regarding comity concerns raised by possible discovery or testimony of superior court judges, PPLM's evidentiary offerings demonstrate that this case can be managed so as to avoid inappropriate intrusions into the internal operations of the state judiciary. As a small part of the whole, plaintiffs will likely seek to introduce testimony as to the number of judges who, though not having recused themselves from § 12S cases, have in the past been so hostile that attorneys and their minor clients avoided them. Such evidence appears at best relevant to delay in processing petitions, a fact that can be proven directly by statistics. It appears that plaintiffs can make their case without subjecting any state judges to the rigors of extensive discovery, and without indiscriminately summoning them into court.[8]

We therefore hold that the district court gave insufficient weight to its obligation to assess the essential nature of the litigation to see whether its proper objectives could be attained without the intrusion into internal operations of the state judiciary. We see no reason, on this record, why this lawsuit cannot be so managed. We have in mind our observations in another case where a district judge had demonstrated his acute sensitivity to state concerns:

> [F]ederal courts are frequently called upon to weigh the strength of state interests, and the care with which the state has crafted the means to vindicate those interests, against the resulting burdens on individual rights. We do not think it can fairly be said that in so doing they have consistently either undervalued or overvalued the state interests at issue. The efforts of the district court in this case to identify possible sources of state-federal friction demonstrate an acute sensitivity to the federalism concerns underlying *Pullman.* We are confident that this same sensitivity will enable the court on remand, to focus on assessing the relevant conditions without being distracted by what the court determines to be extraneous considerations and overbroad assumptions.

*Guiney v. Roache,* 833 F.2d 1079, 1085 (1st Cir.1987).

We briefly address the third reason given by the district court for its *Burford* abstention decision—the existence of state court proceedings, wherein PPLM might amend its complaint and raise its federal issues. The fact is that at present the state and federal proceedings are not identical. At most, they are parallel—each is bottomed on the law of its forum. As we have recently stated, "the simple existence of parallel state proceedings is *not* a reason to abstain. There is no special circumstance here, such as a special federal statutory policy favoring a single forum, as there was in *Colorado River,* 424 U.S. at 817–21 [96 S.Ct. at 1246–48]." *Bath Me-*

---

**8.** We do not hold that all questioning of state judges is inappropriate. Yet we recognize that questioning state judges in federal proceedings regarding their official conduct raises comity concerns, *Dennis v. Sparks,* 449 U.S. 24, 31 n. 7, 101 S.Ct. 183, 188 n. 7, 66 L.Ed.2d 185 (1980), and may be inappropriate where other sources are available. We leave it open to the district court to determine when, and if, the presentation of plaintiffs' case oversteps the boundaries of propriety.

*morial Hosp.*, 853 F.2d at 1015. Where a plaintiff bifurcates state and federal claims in order to preserve a federal forum for federal claims as envisioned by *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), weighing the availability of the state forum as an additional ground for abstention seems particularly inappropriate. *See Cuesnongle v. Ramos,* 835 F.2d 1486, 1497 (1st Cir.1987).[9] More importantly, if a federal court could abstain on the basis of the possibility that a state proceeding could be made to present a federal issue, the abstention "exception" recognized by *Colorado River* would quickly metamorphose into the rule. *See Guiney,* 833 F.2d at 1079.

As for abstention on the basis of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the district court realized that there was no state-initiated proceeding, criminal or civil, to enjoin. *Cf. Simopoulos v. Virginia State Board of Medicine,* 644 F.2d 321 (4th Cir.1981) (*Younger* abstention appropriate in light of concurrent state license revocation proceedings based on criminal prosecution of doctor for violation of abortion regulation). Rather, it based its decision on the assumption that it was being asked to interfere directly with state court practices. As discussed above, such interference will not occur here because of the remedy sought. Thus, the district court erroneously relied on *Parker v. Turner,* 626 F.2d 1 (6th Cir. 1980), where the federal court was asked in effect to monitor "the manner in which state juvenile judges conducted contempt hearings in non-support cases," *id.* at 8, and on *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1973), where the federal court was expected to see to it that a county magistrate and judge stopped their practices in setting bonds arbitrarily, imposing harsher than usual sentences, and requiring payment for jury trials for black plaintiffs. Under the defendants' characterization of the nature of this litigation, accepted by the court, these authorities might be applicable. But these cases were

not statutory challenges, and thus the acceptable remedy of invalidating the statute was not available. *O'Shea,* 414 U.S. at 500, 94 S.Ct. at 678; *Parker,* 626 F.2d at 6. The instant case challenges the statute as unconstitutional. This is therefore not a case threatening interference with ongoing state proceedings or practices.

## IV.

At this juncture we take note of the two branches of PPLM's challenge to § 12S. One, as we have related, is the claim that "The procedures in fact afforded ... constitute an undue burden." This specific claim has been part of the case since March 26, 1984 with the filing of a more definite statement. The other claim was tangentially referred to a year later in an affidavit of counsel supporting a motion for reconsideration of the district court's dismissal of the complaint against the judicial defendants. This was the contention that § 12S "cannot be shown by defendants actually to have served the goal of encouraging parental consultation." A year after that, in June 1986, in counsel's affidavit supporting opposition to defendants' motion to dismiss the case as to all remaining defendants, PPLM elaborated on this contention by asserting that "defendants will be unable to carry their burden of proving that the statute ... actually furthers any compelling state interests." By the time of oral argument, this contention received at least equal or greater prominence to that given the "undue burden" argument.

We shall assume, without deciding, that the issue whether the actual workings of § 12S really do serve the state's compelling interests was properly and timely raised. The thrust of plaintiffs' assertion is that the two-parent consent requirement in operation contradicts rather than promotes intrafamilial communication. Plaintiffs assert that in many cases a minor fears that one parent will disapprove of her decision to seek an abortion. Because § 12S requires consent of both parents, the minor

**9.** This is not to say that the availability of a state forum for federal claims is irrelevant: if *no* state forum were available, this would militate against abstention.

therefore elects to tell neither parent of her predicament, and instead seeks judicial approval. According to this argument, a one-parent consent requirement would more successfully advance the state interests while reducing the burden upon minors' constitutional rights.

We hold, however, that an operational challenge based on an inadequate state interest is not open to PPLM. It seems clear to us, after a careful rereading of *Bellotti II*, a decision that dealt with the precise procedure now before us, that a majority of the Court has made a clear and final policy declaration that the two-parent consent procedure serves the compelling state interests of encouraging a mature decision regarding abortion and encouraging parental involvement.

> [T]he guiding role of parents in the upbringing of their children justifies limitations on the freedoms of minors. The State commonly protects its youth from adverse governmental action and from their own immaturity by requiring parental consent to or involvement in important decisions by minors. But an additional and more important justification for state deference to parental control over children is that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."
>
> .    .    .    .    .
>
> Unquestionably, there are many competing theories about the most effective way for parents to fulfill their central role in assisting their children on the way to responsible adulthood. While we do not pretend any special wisdom on this subject, we cannot ignore that central to many of these theories, and deeply rooted in our Nation's history and tradition, is the belief that the parental role implies a substantial measure of authority over one's children.

443 U.S. at 637–38, 99 S.Ct. at 3045 (citation and footnote omitted) (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925)).

These passages indicate that, at least in part, it is the preservation of the authority of each parent that forms the compelling interest in regulating minors' abortions. This theme has resounded repeatedly in *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), *Planned Parenthood Association v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983), and *H.L. v. Matheson*, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981). The Court of Appeals for the Eighth Circuit, sitting en banc and dealing with a two-parent notice requirement—not precisely covered in *Bellotti II*—held that these decisions had foreclosed an empirical attack. *Hodgson v. Minnesota*, 853 F.2d 1452, 1462–65 (8th Cir.1988) (en banc). We agree.

The Court could so broadly identify a compelling state interest or so tentatively validate the procedures used to further that interest that its pronouncement on a facial challenge would not foreclose an operational challenge. In such a case, the Court's initial determination might be open to revision based on subsequently marshalled empirical evidence. We do not think such a case is before us. Specifically addressing the two-parent requirement, the *Bellotti II* plurality indicated:

> We are not persuaded that, as a general rule, the requirement of obtaining both parents' consent unconstitutionally burdens a minor's right to seek an abortion.... At least when the parents are together and the pregnant minor is living at home, both the father and mother have an interest—one normally supportive—in helping to determine the course that is in the best interest of a daughter.... As every pregnant minor is entitled in the first instance to go directly to the court for a judicial determination without prior parental notice, consultation, or consent, the general rule with respect to parental consent does not unduly burden the constitutional right.

443 U.S. at 649, 99 S.Ct. at 3051. Plaintiffs interpret this language, as did the district court in *Hodgson*, to leave open the ques-

tion whether a state may require the consent of both parents when only one has an active role in raising the minor. We read *Bellotti II,* however, to hold that a state may require both parents' consent so long as a proper judicial bypass is available.

We find support for our interpretation in Justice Powell's directive that where one parent consents, his or her support be given "great, if not dispositive, weight" in judicial consent proceedings. 443 U.S. at 649 n. 29, 99 S.Ct. at 3051 n. 29. This suggests that a majority of the Court[10] envisioned that the judicial bypass cures the possible overbreadth of the two-parent consent requirement, that is, its application where both parents are not active in raising the child. Coupled with the exemption in § 12S for divorced, non-custodial parents, we believe the state interests here are not subject to the broad attack envisioned by plaintiffs.

PPLM's other claim, however, cannot at this juncture be dismissed as a matter of law.[11] As we indicated earlier in this litigation, "a requirement unduly burdensome in operation will be struck down even if not clearly invalid on its face." *Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1011 (1st Cir.1981). It was as to the "undue burden" part of the constitutional calculus that Justice Powell in *Bellotti II* left open the possibility of a future operational challenge.[12] We grant that plaintiffs' burden to demonstrate unconstitutionality as applied is a considerable one in the aftermath of the Court's indication in *Bellotti II* that such a statute is facially valid. More than occasional frustration, discomfort, and inconvenience would have to be shown. To

use the language of the district court in *Hodgson,* apparently approved by the court of appeals en banc, the success of an operational attack in this context requires proof of a "systemic failure to provide a judicial bypass option in the most expeditious, practical manner." 648 F.Supp. at 777.

### V.

We conclude that this case may proceed without unduly interfering with the Massachusetts judicial system, and that abstention is therefore inappropriate under either the *Burford* or *Younger* line of cases.

*The judgment is vacated and the case is remanded for further proceedings.*

BREYER, Circuit Judge (dissenting).

As I understand appellants' present, primary challenge to the Massachusetts abortion-consent statute, it does not call for federal court abstention, but neither does it require further district court hearings.

The Massachusetts statute requires an unmarried minor seeking an abortion *either* to obtain her parents' consent *or* to obtain the permission of a judge, who must grant permission if he finds *either* that the minor is "mature and capable of giving informed consent," or that an "abortion ... would be in her best interests." Mass.Gen. Laws Ann. ch. 112, § 12S (West 1983) (emphasis added.) The Supreme Court, in *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II*), wrote that such a statute is constitutional. But, appellants now argue the Court wrote this without the benefit of a record that would show how such a statute worked in

---

**10.** No opinion in *Bellotti II* garnered the support of a majority of the Court. However, Justice White's dissent makes it clear that he would go farther than the three justices joining Justice Powell in upholding regulations of minors' abortions, including parental consent requirements. We therefore view Justice Powell's opinion as representing the views of a majority of the Court for present purposes.

**11.** We note that to date extensive pretrial proceedings have focused on the nature of the claim (shifting from a facial to an operational challenge), the identity of the defendants, and the federal suit's relation to the state court chal-

lenge. Plaintiffs' efforts have been directed in recent proceedings toward addressing abstention challenges. We are not confident that the extent of the factual record plaintiffs hope to develop at trial has been fully defined. We express no view as to whether, once it is, it will be sufficient as a matter of law.

**12.** *See* 443 U.S. 622, 645 n. 25, 99 S.Ct. 3035, 3049 n. 25 ("In the absence of any evidence as to the operation of judicial proceedings under § 12S ... we must assume that [judicial proceedings will provide confidentiality, lack of procedural burden, and speed]").

practice. They want to compile a factual record in the district court and obtain court findings of fact that, in their view, will show that the statute unconstitutionally burdens the right of a minor to choose to have an abortion.

The panel would remand this case to permit the appellants to present the evidence that appellants hope will lead to these findings—and a consequent holding of unconstitutionality. After reviewing the facts that appellants hope to establish, I would not remand this case, for I do not believe those facts, even if established, could lead the Supreme Court to change its *Bellotti II* statement that such a statute is constitutional.

To understand why I reach this conclusion, one should first consider precisely what appellants hope to show. The majority's summary, drawn from an article that appellants attached to their court papers, indicates they wish to show the following:

(1) Of 62 superior court judges, 10 have recused themselves [from abortion cases] and approximately ¼ of the remainder are avoided for reasons of hostility; sometimes many of the latter are sitting in the same county;

(2) Courts are not open evenings or weekends; the difficulty in scheduling particular judges requires 2 or more trips by a minor, with delays of 2 to 4 days in obtaining an abortion being common;

(3) Judicial authorizations are sought by few minority applicants;

(4) Any decrease in Massachusetts abortions seems to be accounted for by visits to clinics in neighboring New Hampshire and Maine;

(5) Consultation with parents does not seem to be either stimulated by § 12S or helpful;

(6) The hearings are often rituals, the minors being well coached, and 'maturity' being difficult to judge in a brief session; and

(7) Of 1,571 applications for abortion between 1981 and 1983, only 7 were denied and 5 of these denials were overturned on appeal.

*See* Panel Opinion, at 461 n. 6. Appellants believe that findings of this sort will show that the statute's judicial approval requirements unreasonably intimidate minors, while at the same time, given the overwhelming approval rate, the statute serves no significant 'screening' function.

Next, one should examine the proceedings in the Eighth Circuit case, *Hodgson v. Minnesota,* 648 F.Supp. 756 (D.Minn.1986), *rev'd in part,* 853 F.2d 1452 (8th Cir.1988). The plaintiffs in *Hodgson* created the very kind of factual record that plaintiffs seek to establish here. See Panel Opinion at 463. The district court, after hearing evidence, made findings of fact at least as favorable to plaintiffs as any that plaintiffs here hope to establish. It found, for example, that the

experience of going to court for a judicial authorization produces fear and tension in many minors. Minors are apprehensive about the prospect of facing an authority figure who held in his hands the power to veto their decision to proceed without notifying one or both parents. Many minors are angry and resentful at being required to justify their decision before complete strangers. Despite the confidentiality of the proceeding, many minors resent having to reveal intimate details of their personal lives to these strangers. Finally, minors are left feeling guilty and ashamed about their lifestyle and their decision to terminate their pregnancy. Some mature minors and some minors whose best interests it is to proceed without notifying their parents are so daunted by the judicial proceeding that they forego the bypass option and either notify their parents or carry to term. Some minors are so upset by the bypass proceeding that they consider it more difficult than the medical procedure itself. Indeed, the anxiety resulting from the bypass proceeding may linger until the time of the medical procedure and thus render the latter more difficult than necessary.

648 F.Supp. at 763–64. The district court also found that the "effective length of the delay [that the statutory procedure cre-

ated] may reach a week or more" in many cases. *Id.* at 765. It found that during one period, out of 3,573 judicial approval petitions filed in Minnesota courts, 6 petitions were withdrawn before decision, 9 were denied, and 3,558 were granted. *Id.* The district court drew a factual conclusion of the sort that plaintiffs urge here; it said that the statute "fails to serve the State's asserted interest in fostering intra-family communication and protecting pregnant minors." *Id.* at 775.

The important point about *Hodgson* is what the court did next. *Despite* these findings, the court did not say the statute was unconstitutional (except in two respects not relevant for present purposes). Rather, the district court said that the statute was *constitutional.* Its reason was simply that the Supreme Court had indicated in *Bellotti II* and *Planned Parenthood Association v. Ashcroft,* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983), that statutes of the sort at issue (here and in *Hodgson*) are constitutional.

The Eighth Circuit, sitting en banc, held that the entire statute was constitutional. It reversed (by a divided vote) the district court's findings of unconstitutionality in respect to two special parts of the statute. I can find no indication that *any* judge of that appellate court disagreed with the district court about the statute's basic constitutionality.

In my view, the Eighth Circuit is correct. There is no point in permitting appellants to prove the general facts about the statute's operation that they seek to prove, facts that amount to a showing that court hearings themselves may inhibit many minors from seeking permission for an abortion, that the hearings involve several days' delay, and that the process leads to nearly universal court approval of minors' petitions for abortions. There is no point because, assuming plaintiffs can make such a showing, I still do not see how one could reconcile a holding that the statute is unconstitutional with *Bellotti II.* In *Bellotti II* the Court held that the state may regulate abortions for minors, that no third party, such as a parent, may have a categorical

"veto" over a decision to have an abortion, but that a judge may review a decision (though the judge may withhold permission only if the minor is immature and the abortion is not in her best interest). 443 U.S. at 633–51, 99 S.Ct. at 3042–52. Justice Powell specifically stated that this very statute "satisfies constitutional standards in large part," though it "falls short in two respects." 443 U.S. at 651, 99 S.Ct. at 3052. These "two respects" are not now present in the (amended) statute before us.

I conclude that the matter is not perfectly clear. That is because, in a footnote, Justice Powell added the following:

> Intervenors take issue with the Supreme Judicial Court's assurances that judicial proceedings will provide the necessary confidentiality, lack of procedural burden, and speed of resolution. In the absence of any evidence as to the operation of judicial proceedings under § 12S ... we must assume that the Supreme Judicial Court's judgment is correct.

443 U.S. at 645 n. 25, 99 S.Ct. at 3049 n. 25. This footnote, however, seems to me to refer to challenges to the *manner* in which Massachusetts implements its statute, whether, for example, its procedural rules are adequate or (perhaps) whether the courts follow them in practice. And, these challenges seem appropriately brought, in the first instance, before the Massachusetts courts. The footnote, in my view, does not refer to a challenge to the statute itself based upon the view that the very existence of this judicial approval proceeding improperly burdens the minor's right to choose an abortion. That is to say, the footnote refers to delays of more than 2 to 4 days, and to burdens other than the psychological burden inherent in the fact of the proceeding itself. That even expeditious judicial proceedings might take several days, that their very existence might intimidate minors, that those most likely to feel intimidated are those least able to cope effectively with the judicial system, all would seem fairly obvious from the outset. And, had the Court intended to leave open the possibility that this type of showing would lead to a change of mind about the statute, it would not have said so explicitly

that the statute was constitutional; or, at least, the footnote would have made this possibility more apparent. I also note that appellants nowhere explain how their proposed factual showing is designed to bring about a "judicial approval" system that is significantly less intimidating or more useful. Yet, the Court's opinions in *Bellotti II* lead me to think it virtually inconceivable that the Court believes the Constitution requires a state to permit even immature minors to choose an abortion without *anyone's* (neither parent's nor judge's) consent.

I recognize a degree of ambiguity in the footnote, and I recognize the possibility that the Supreme Court could change its mind about this statute. It is also true that factual records, as in the instance of school desegregation, sometimes help produce a change of mind. Yet, before courts spend the considerable time, effort, and resources involved in building records of "legislative fact" not specific to the particular case at issue, there must be more reason than is present here to believe the law is different from, or about to become different from, what the Supreme Court has previously stated. Otherwise, it seems more expeditious for a lower court simply to point out that, on the present state of the law, the factual proof would not change the legal result. Those challenging the law may submit to courts of appeals, and then to the Supreme Court, the facts they wish to show by means of statements in their briefs or references to articles, or appropriate appendices. The appropriate courts can then make clear whether the factual showing could make a legal difference. This is not an area of the law where significant challenges to prior precedent are likely to escape the Court's attention.

Finally, I note that appellants, in the district court, raised a fundamentally different type of challenge to the Massachusetts law, a challenge that they seem to press somewhat less forcefully in this court. In the district court they seemed to say that even if the Massachusetts statute is itself constitutional, Massachusetts has not *applied* its law in a constitutional way; they seemed to say that Massachusetts judges, for example, did not correctly follow Massachusetts' own law, as embodied in its statute, its Standing Order, *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, Appendix 2 (1st Cir.1981), and in Justice Liacos' modification of that Standing Order, Panel Opinion at 460–461. Alternatively, lower Massachusetts courts may not have given the words in these legal documents constitutionally permissible interpretations. Insofar as appellants raise these kinds of claims (and I must admit I am not certain they are still doing so), the district court was right to abstain in light of the "comity" considerations that the district court set forth. It seems inappropriate for a federal district court, in the present circumstance, to hold a fact based hearing on the question of whether Massachusetts judges are systematically violating Massachusetts' own law (*e.g.,* by harassing minors seeking an abortion) rather than requiring these appellants to raise such issues in the state proceedings where they are already parties, thereby leaving to the Massachusetts Supreme Judicial Court the job of administering its own judicial system. *Cf. Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (abstention appropriate because challenged state procedures for discipline of attorneys are "judicial in nature"); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (abstention appropriate because challenged state statutory contempt procedures are process "through which [the state] vindicates the regular operation of its judicial system"); *Louisiana Power & Light Company v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) (abstention appropriate because eminent domain proceedings are "special and peculiar," and "intimately involved with sovereign prerogative"); *see also Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (while suit challenging state allocation of water is not barred by abstention doctrine, "several factors" counsel against concurrent federal jurisdiction). Insofar as appellants' challenge turns on interpreta-

tions of Massachusetts law, *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), counsels abstention.

For these reasons I would affirm the judgment of the district court.