In re PUBLIC SERVICE COMPANY
OF NEW HAMPSHIRE, Debtor.

PUBLIC SERVICE COMPANY OF
NEW HAMPSHIRE, Plaintiff,

v.

STATE OF NEW HAMPSHIRE and
New Hampshire Public Utilities
Commission, Defendants.

Bankruptcy No. 88–00043.
Adv. No. 89–006.

United States Bankruptcy Court,
D. New Hampshire.

Feb. 16, 1989.

See also, Bkrtcy., 95 B.R. 275.

Richard Levin, Martin L. Gross, Concord, N.H., Don Willenburg, for Public Service Co.

Geoffrey B. Kalmus, J. Michael Deasy, for the Unsecured Creditors Committee.

Richard N. Tilton, Howard J. Berman, for the Equity Committee.

Larry M. Smukler, Sr. Asst. Atty. Gen., Concord, N.H., Norman H. Stahl, Mark W. Vaughn, Daniel J. Callaghan, Manchester, N.H., for State of N.H.

Gerrard F. Kelley, for U.S. Trustee.

George J. Wade, Barbara J. Gould, New York City, and David J. Dunfey, Hampton, N.H., for Citicorp and Consolidated Utilities & Communications, Inc. (CUC).

Robert E. Ducharme, Manchester, N.H., for First Fidelity Bank and Amoskeag Bank.

David W. Marshall, Concord, N.H., for New England Elec. Service.

Michael W. Holmes, Consumer Advocate, Concord, N.H., for the State of N.H.

John C. Ransmeier, Concord, N.H., for Vermont Public Service Corp.

Robert A. Backus, Manchester, N.H., for Seacoast Anti–Pollution Group, Citizens within the 10–Mile Radius, Campaign for Rate–Payer's Rights.

AMENDED FINDINGS AND CONCLU-
SIONS ON MOTION FOR
PRELIMINARY INJUNCTION

JAMES E. YACOS, Bankruptcy
Judge.

This adversary proceeding came on for hearing on February 10, 1989 regarding the Motion for Preliminary Injunction Against Involuntary Rate Case to Prevent Interference With Chapter 11 Case, filed by Public Service Company of New Hampshire (the "Debtor"), and the Objection thereto, filed by the State of New Hampshire (the "State") and the State of New Hampshire Public Utilities Commission (the "NHPUC"). The Debtor requests this court to preliminarily enjoin the State and the NHPUC from continuing the proceedings commenced by the NHPUC by Order Of Notice dated January 11, 1989 (the "Involuntary Rate Case"), NHPUC docket no. DR89–6, pursuant to sections 362(a), 525, and 105 of the Bankruptcy Code.

At the outset of the hearing, the court considered the Motion to Dismiss and the Motion for Abstention, filed by the State, which the court denied by separate orders that date. The court took several hours of testimony and, at the conclusion of the hearing, the court determined that it would grant a preliminary injunction. This document sets forth the court's findings of fact and conclusions of law in support of that decision.

The court determined it was appropriate to rule only on the section 105 issue and the question of granting or not granting a section 105 preliminary injunction. In order to grant preliminary injunctive relief, a court must find:

(1) that plaintiff will suffer irreparable injury if the injunction is not granted;

(2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant;

(3) that plaintiff has exhibited a likelihood of success on the merits; and

(4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981) (citations omitted). The court sets forth its findings and conclusions in support of granting a preliminary injunction in this matter as follows:

1. First of all, with regard to an adequate remedy at law, it is not sufficient to say that the debtor can have a hearing before the NHPUC because the very matter at issue is the time factor, i.e., the need to not divert people from reorganization plan activity at this crucial stage of the chapter 11 proceeding. I say "crucial" in the sense that there is still alive the possibility of a consensual plan of reorganization. To divert the Debtor's people from that activity at this time, until there can be a determination by the NHPUC as to narrowing down the procedures or modifying them in that forum, would in effect be to deny the relief. The relief needed is quite time-specific here, in my judgment. I also believe that the remedy is not adequate in law in that I do not think that the NHPUC is particularly equipped to weigh reorganization process requirements under the federal Bankruptcy Code; these would be rather specialized issues that I am sure are not routine matters for the NHPUC to be concerned with and that would just lead to further delay and further denial of necessary relief to the Debtor and this bankruptcy estate.

2. With regard to the irreparable harm factor and the balancing of harms, I am going to assume for present purposes that the maximum period that this preliminary injunction could be in effect—until there is a full hearing on the merits to determine whether a permanent injunction would issue—is six months. I do not mean to suggest that six months from now is the earliest time this court can calendar a trial on the Complaint for Injunction but will use that as a maximum for present purposes. In determining irreparable harm and balancing the harms to the respective parties, I need some time reference and I think six months is a realistic maximum in this case. Additionally, if there is going to be a consensual plan of reorganization in this case, a consensual plan is going to be reached

long before six months from now or it is not going to happen.

3. Considering that time frame, I have to determine what the interests are of the State and the entities that they represent that would be harmed by injunctive relief. Basically it comes down to a delay in the effectuation of lower ratepayer rates or a delay in the refund of alleged overcharges that this Debtor may or may not be earning over an allowed rate of return. The record establishes that the amount involved during a six month period would be approximately 5 million dollars. I take judicial notice that the gross revenues of this debtor exceed $500,000,000.00, as I found in a prior opinion. See *In re PSNH*, 88 B.R. 521, 525 (Bankr.D.N.H.1988).

4. The State also asserts in a sort of general way that injunctive relief would interfere with its regulatory activity. I think that is a proper argument for abstention, but I have already dealt with that and I do not think it is an independent state interest that has to be weighed as a harm for injunctive purposes. Abstention raises *Burford* decision factors, see *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), which include consideration of federal intrusion into internal state affairs involving important state interests. For the reasons indicated earlier, I do not think that abstention is appropriate here, particularly if the injunctive decree can be suitably crafted in a narrow enough fashion to protect the State's interest and yet allow recognition of federal reorganization imperatives. See *Planned Parenthood League of Massachusetts, et al. v. Francis X. Bellotti, etc., et al.*, 868 F.2d 459 (1st Cir.1989) (2–1 decision).

5. The State may suffer a 5 million dollar exposure during this period of delay, but the State is not going to and need not lose any right it has to recover the alleged overcharges under retroactivity principles. The decree granting injunctive relief can and should protect the State against any loss of recovery upon a justifiable showing of overcharges. A debtor is not entitled to come into a bankruptcy court and overcharge its customers, where the debtor is subject to regulatory activity, and then take the position that the overcharge cannot be recovered because the regulatory authority was stayed from doing anything about it. It is an elementary equitable principle that a court must consider both sides of the coin. It would be inequitable to stay the State on one hand, and on the other hand hold that the State forfeited some rights because it did not take action.

6. Therefore, I do not find that there is any real substantial harm to the State, as weighed against the harm to the federal interest involved here, by the granting of such a preliminary injunction. In evaluating the harm asserted, I note that the State and its agencies from January through December of 1988 found it justifiable to hold off acting against any overcharges, although the monthly reports filed with the NHPUC by PSNH included data showing a rate of return averaging about 17.5 percent, as opposed to a rate of return at about 16.6 percent, which 16.6 percent rate instigated the NHPUC's Involuntary Rate Case. I also note that under state law and practice the state could not seek to recover any of the alleged overcharges, even if an injunction is not issued, before the March 21, 1989 date of its first scheduled hearing under Docket No. DR 89–6.

7. The "overcharge" contention asserted by the State is not the simple matter in which it has been portrayed by that phraseology. Indeed, it is something of a misnomer to refer to this matter as a "simple overcharge issue" under applicable New Hampshire regulatory law. The record clearly establishes that what is involved is not some discrete "overcharge" issue in the sense of the debtor charging a specific amount per kilowatt hour to ratepayers in excess of some specific allowed amount per kilowatt hour under State regulations. The so-called "overcharge" is just a shorthand reference that counsel use but the issue really is whether the debtor is earning in excess of an allowed annual rate of return. That is a much more complex process than simply a tariff violation implied by the "overcharge" connotation. To go forward with these hearings would or could mean, the record establishes, a complete

evaluation of the assets and liabilities of the debtor in terms of what is an appropriate annual rate of return. As explained by Eugene F. Sullivan, Finance Director of NHPUC, the pending proceeding before the PUC is a "nonenergy rate case" as contrasted with the more routine, fairly simple ECRM energy cost adjustment proceedings.* In the nonenergy rate case the degree of evaluation of a utility's rate base and rate of return apparently is largely in the discretion of the NHPUC and in effect depends "on how far the Commission wants to go" in the words of the witness. Suffice it to say that DR89–6 could lead to a full-scale reopening of all aspects of determining the company's rate base and annual rate of return. To be safe PSNH would have to prepare for the scheduled PUC hearings at the maximum exposure in this regard.

8. The record before this court also establishes that even the mathematical-sounding concept of "rate of return" is anything but as simple as it may appear. The concept requires a determination first of the appropriate rate base, i.e., the amount invested in property actually delivering service to customers. The calculation of the rate of return on this base then becomes a very complex process. The process begins by determining and pro-rating a regulated company's cost of its debt. This step is relatively simple. Next, the company's cost of its equity capital has to be established and pro-rated. This step is quite complicated. Establishing the equity of a company that *is* paying a dividend is difficult and complex. It is more difficult and complex when the company is *not* paying a dividend, as is the case with PSNH, and it is even more difficult and complex when the company is not paying a dividend and when the company is in bankruptcy. See generally Phillips, "The Regulation of Public Utilities," Second Edition, Public Utilities Reports, Inc., Arlington Virginia, 1988, pp. 375–381, in which it is discovered that "cost of equity capital" concept involves considerable circular reasoning. See also Bonbright et. al., "Principles of Public Utility Rates," Second Edition, Public Utility Reports, Inc., 1988, pp. 305–339; 123 *Public Utilities Fornightly* (February 16, 1989), 4–6, 55–56. Even a quick exposure to these learned authors, and their various alternative equations and formulas, documents just why the DR89–6 proceeding before NHPUC can represent a much more intrusive disruption of the debtor-in-possession's activities than the simple corrective action suggested by the "overcharge" terminology.

9. I think that the State itself has recognized that there are larger interests involved in this case than a simple overcharge issue, and that is whether there is going to be a real, rehabilitated, healthy electric service utility in this State after these proceedings are over. I have to balance the federal interest against the State's interest. That federal interest is the maximization of values for all parties in interest in this reorganization proceeding—particularly through a consensual plan of reorganization, if possible—rather than having a litigated plan, with all the delays, costs, and expenses of going from consensual to litigated reorganization.

10. I have not been told that the prospects of a consensual plan are dead by the state, the debtor, or the committees. I am operating on the basis that a consensual plan is still a live option notwithstanding technical and strategic moves taken by all sides here to position themselves better to bargain. I do believe that this case is at a crucial stage in that sense. That is, whether a consensual plan can be reached. I think it is at a crucial stage also because I have set up some rather extensive hearings by Orders to Show Cause entered last month for hearings commencing February 22, 1989, which may result in orders that will expedite this matter and that will perhaps facilitate a consensual resolution. I do not think it is appropriate to divert the Debtor's people from preparing for that series of hearings, and what further procedures may result from those hearings, to prepare for a full-blown rate base case before the NHPUC.

* ECRM refers to "Energy Cost Recovery Mechanism" in the New Hampshire regulatory system.

11.   After balancing the harms on each side, I think the balance definitely weighs in favor of the Debtor. Regarding the contention that this Debtor is earning more than it should during these proceedings, the State does not have to be harmed ultimately. The State can be protected, and it can preserve that claim to the extent that it has to be resolved ultimately, in either litigation or in a consensual plan.

12.   As for the public interest factor, a lot of the public interest here has been subsumed in the above discussion regarding the balancing of harms. The effect on ratepayers is approximately 5 million dollars, which should be recoverable anyway, if and when the State proves that there were unjustifiable overcharges. In the public interest factor I also take into account that this court is not going to restrain all regulatory activity by the NHPUC against this Debtor. The injunctive relief will be directed at the Involuntary Rate Case, DR 89–6, and matters and proceedings directly related to that docket number. This injunction will result in a relatively short delay that may well be instrumental in getting a rehabilitated, healthy electric utility company in this State much quicker and much less expensively than the alternative. Full-blown rate base hearings could extend late into this year and then, regardless of the outcome at the NHPUC level, the Debtor has to start all over again with regard to rate adjustments for plan purposes. Finally, at the end of the process, the regulatory agency in place at that stage has to approve any rate changes in the plan. To go into a full blown rate hearing at this stage would entail delay damages and a waste of money far above the 5 million dollar exposure referred to above even if for some reason that exposure can not be protected and covered.

13.   Regarding the likelihood of success on the merits factor, it is arguable that this court may ultimately grant a permanent injunction and order that any basic rate changes be deferred until plan formulation and confirmation is reached, subject to some definite time frame so that such deferral cannot go on indefinitely. However, I do not need to determine those matters finally now.

14.   The likelihood of success on the merits factor is a specialized problem in bankruptcy with regard to injunctions. It has been held that, when considering injunctive requests by a debtor in a reorganization case against third-party activity, courts should analyze whether the activity sought to be enjoined is going to threaten the reorganization or destroy the prospects of reorganization and need not analyze the merits of the underlying regulatory proceeding or lawsuit in the manner normally employed in nonbankruptcy cases. See *Otero Mills v. Security Bank & Trust*, 25 B.R. 1018, 1021–22 (D.N.M.1982); *Lahman Mfg. Co. v. First Nat'l Bank*, 33 B.R. 681, 685 (Bankr.D.S.D.1983); *In re Landmark Air Fund II*, 19 B.R. 556, 560 (Bankr.N.D. Ohio 1982). See also *In re Hunt*, 93 B.R. 484, 18 BCD 807, 812–16 (Bankr.N.D.Tex. 1988). These cases establish that it is justifiable for a bankruptcy court to grant injunctive relief even though the court does not find, and need not find if time urgencies prevent, that there is a likelihood of success on the particular substantive merits of the underlying litigation. The focus is on whether there is a realistic prospect for reorganization and whether the very continuation of the litigation at the moment will threaten that prospect. In this case, for present purposes, the focus would be on whether there is a realistic prospect for a consensual reorganization and whether the very continuation of the litigation at the moment will threaten that prospect. I can see that, with the proper procedures, there is still the likelihood of that possibility. The possibility of a consensual plan of reorganization is not dead notwithstanding all the fulminations and proclamations by both sides against each other. So I think that ground for granting injunctive relief is likewise reached.

15.   The court will not base the injunctive order on the "bad faith" or "ulterior motive" grounds asserted by the Debtor—for various reasons. See *National Hosp. & Institutional Builders Co. v.*

*Goldstein*, 658 F.2d 39 (2d Cir.1981), *cert. denied*, 454 U.S. 1149, 102 S.Ct. 1014, 71 L.Ed.2d 303 (1982); *In re Beker Industries Corp.*, 57 B.R. 611 (Bankr.S.D.N.Y.1986). On the issue of bad faith, it has to be recognized that the concept also has a rather specialized meaning in connection with bankruptcy cases under the federal Bankruptcy Code. Bad faith in the bankruptcy context does not require a showing of an evil mind within the ordinary concept of bad faith in other contexts. It is only necessary to show that the party charged with bad faith is impermissibly interfering with the provisions and underlying policies of the Bankruptcy Code, in a manner that justifies denial of relief to that party if such relief would be inconsistent with the intended scope and need for relief under the Bankruptcy Code. Alternatively, if the party against whom the bad faith is alleged is not itself seeking relief under the Bankruptcy Code, the party may nevertheless be enjoined from continuing to take actions that are seriously and substantially inconsistent with the provisions of the Bankruptcy Code—actions that, in the reorganization context, threaten the rehabilitative policies underlying chapter 11 of the Bankruptcy Code.

16. There is no showing on this record of bad faith in the evil mind sense. The Debtor has neither shown nor has even really tried to show that State officials have without even any arguable justification set out to totally frustrate the reorganization proceedings by starting the rate hearing in question. There is an arguable basis for the State and the NHPUC initiating the involuntary rate case in the unsettled state of the law regarding the overlapping powers of a bankruptcy court and a regulatory agency in a utility reorganization case.

17. In regard to bad faith in the "non evil mind" sense, that might present an alternative ground for decision and the court in the normal case for reasons of judicial economy might proceed to decide that issue. However I could not reach that issue without really resolving those federal-state conflict issues, the preemption issues, the supremacy issues that are raised

in the declaratory judgment action, ADV # 89–8. I do not think this tail should wag that dog. Those are large issues that should be adequately briefed. I should have appropriate time to rule on them. There is need for injunctive relief here *now* in my judgment on the section 105 ground, on the basis of diversion of the Debtor's people from necessary reorganization activities and the threatening of the prospects for a consensual reorganization plan at a crucial stage of this case.

18. I am unsure whether there is an independent ground for stay here under section 362 of the Bankruptcy Code. Time does not permit careful consideration of the section 362 issue and, inasmuch as the considerations for preliminary injunctive relief under section 105 of the Bankruptcy Code are sufficient to justify an affirmative entry of an injunctive order, the court finds it unnecessary to determine whether there already is, by operation of law, an automatic stay in effect with regard to this matter.

19. Accordingly, I will enter an order granting a preliminary injunction. The Debtor's counsel is directed to draft a form of the order and circulate such draft by noon on Wednesday, February 15, 1989. The order should restrain only the DR 89–6 proceeding and any directly related activity, if that can be defined in a way that does not hamstring the NHPUC from proceeding with routine regulatory activity with regard to this kind of debtor, such as the ECRM matters. The order should also include some protective provisions that in effect will mean that any overcharge rights that the State may have, rights to recover that are being delayed, are not lost by virtue of this injunction. A hearing on the form of the injunctive order to be entered will be held on *Thursday, February 16, 1989 at 11 a.m.*, in the Bankruptcy Courtroom, 7th Floor, 275 Chestnut Street, Manchester, New Hampshire, 03101.

## ORDER GRANTING PRELIMINARY INJUNCTION AGAINST INVOLUNTARY RATE CASE

Public Service Company of New Hampshire filed the "Motion of Public Service

Company for Preliminary Injunction Against Involuntary Rate Case to Prevent Interference with Chapter 11 Case" on January 26, 1989, with supporting Declarations and with an "Ex parte Consented to Motion" for an order shortening time for the hearing on the Motion for Preliminary Injunction. This Court granted the Ex Parte Motion to shorten time and set the matter for hearing on February 10, 1989. Defendants filed objections to the Motion for Preliminary Injunction, and a hearing on the Motion was held on February 10, 1989, at which evidence and arguments were submitted in support of and against the Motion for Preliminary Injunction.

Based on the pleadings and other documents filed in this adversary proceeding and the record in this Chapter 11 case, on the evidence and arguments submitted at the hearing on the Motion, and on the Amended Findings and Conclusions on Motion for Preliminary Injunction, entered February 16, 1989, and good cause appearing, it is

ORDERED:

1. The Motion for Preliminary Injunction is granted, subject to the provisions of this Order.

2. The State of New Hampshire and the State of New Hampshire Public Utilities Commission are enjoined from proceeding with or otherwise continuing rate case DR 89–006 commenced January 11, 1989 (the "Rate Case") and from proceeding with or otherwise continuing any proceeding within or related to the Rate Case, including the filing of direct testimony or documents and the holdings of any hearings regarding temporary rates or permanent rates.

3. This Order does not preclude the conduct by the Defendants of ordinary or routine regulatory oversight and supervision of Public Service Company, including filings, hearings, and orders related to the fixing of Energy Cost Recovery Mechanism charges or the specific investigation of specific components of rates based upon external events that may affect the rates charged or to be charged by Public Service Company.

4. In the event the preliminary injunction granted by this Order is terminated, modified, vacated, or annulled, the rights, if any, of the Defendants to fix rates as of the dates that rates would have been fixed in the Rate Case but for this Order are specifically preserved, and this Order does not determine or affect any such rights.

5. The preliminary injunction granted by this Order shall continue in effect until the entry of the final judgment or decree in the adversary proceeding, unless earlier terminated, modified, vacated, or annulled by subsequent order of this Court.